UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-11118
_____

In The Matter of:  COASTAL PLAINS, INC.,

                                        Debtor.

BROWNING MANUFACTURING,

                        Appellant/Cross-Appellee,

versus

JEFFREY H. MIMS, Trustee for the Bankruptcy
Estate of Coastal Plains, Inc.;
INDUSTRIAL CLEARINGHOUSE, INC.,

                        Appellees/Cross-Appellants.

INDUSTRIAL CLEARINGHOUSE, INC., Successor in
interest to Coastal Plains Inc.; JEFFREY H.
MIMS, Trustee of The Estate of Coastal Plains, Inc.,

                        Appellees/Cross-Appellants,

versus

BROWNING MANUFACTURING, formerly known as
Emerson Electric Company, formerly known
as Emerson Power Transmission Corporation,

                        Appellant/Cross-Appellee.

_____

No. 97-11119
_____

In The Matter Of:  COASTAL PLAINS, INC.,

                                        Debtor.

INDUSTRIAL CLEARINGHOUSE, INC.; JEFFREY H. MIMS,
Trustee of The Estate of Coastal Plains, Inc.,

                        Appellees-Appellants,

versus

BROWNING MANUFACTURING, formerly a
Division of Emerson Electric Company,

                        Appellant-Appellee.

_____

No. 98-10246
_____

In The Matter Of:  COASTAL PLAINS, INC.,

Debtor.

BROWNING MANUFACTURING,

Appellant,

versus

JEFFREY H. MIMS, Trustee for the Bankruptcy
Estate of Coastal Plains, Inc.;
INDUSTRIAL CLEARINGHOUSE, INC.,

Appellees.

INDUSTRIAL CLEARINGHOUSE, INC., Successor in
interest to Coastal Plains, Inc.; JEFFREY H. MIMS,
Trustee for the Bankruptcy Estate of Coastal Plains, Inc.,

Appellees,

versus

BROWNING MANUFACTURING, formerly known as Emerson
Electric Company, formerly known as
Emerson Power Transmission Corporation,

Appellant.

_____

Appeals from the United States District Court
for the Northern District of Texas
_____

June 18, 1999

Before REYNALDO G. GARZA, POLITZ, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

For all but one of the claims at hand, the overarching issue is whether the bankruptcy court abused its discretion by not judicially estopping plaintiffs Industrial Clearinghouse and the Trustee for the bankruptcy estate of Coastal Plains from pursuing claims against Browning, Coastal's largest unsecured creditor; the linchpin being whether nondisclosure of those claims in Coastal's bankruptcy schedules or its stipulation for lifting the automatic bankruptcy stay to allow Coastal's largest secured creditor to foreclose on Coastal's assets, later purchased by Industrial Clearinghouse (formed by Coastal's CEO), falls under the exception to judicial estoppel advanced by plaintiffs, Coastal's successors — that, even though Coastal had knowledge of the claims, the nondisclosure was nevertheless "inadvertent". For plaintiffs' one claim not subject to judicial estoppel (tortious interference), the key issue is whether it is time-barred. Browning appeals the $5.2 million judgment on a jury verdict in favor of plaintiffs; plaintiffs cross-appeal the substantial post-verdict reduction in damages. We **REVERSE** and **RENDER** judgment for Browning.

I.

Coastal Plains, Inc., an equipment distributor, was purchased by Bill Young in 1984 for approximately $9 million. The business plan included making Browning Manufacturing, formerly a division of Emerson Electric Company, Coastal's leading supplier.

- 3 -

In January 1986, Coastal acknowledged its financial problems to its creditors and implicitly threatened bankruptcy if they did not agree to a workout plan, pursuant to which Coastal would return to its creditors inventory they had sold on credit to Coastal; the creditors would pay Coastal 50 percent of the inventory's cost and write off Coastal's debt; and the money so raised would be paid to Coastal's secured lender, Westinghouse Credit Corporation. Many creditors rejected the proposal.

The next month, owed $1.3 million by Coastal, Browning agreed to a transaction which tracked Coastal's earlier proposed workout plan. In late February 1986, Coastal began returning inventory to Browning; this was soon discontinued because Browning's parent, Emerson, wanted to postpone the transaction until the next quarter.

Accordingly, in mid-March, Coastal and Browning agreed that, if the transaction was not completed by 3 April, Browning would transfer the returned-inventory back to Coastal. The inventory-return to Browning was completed by the end of March.

Nevertheless, becoming more concerned about Coastal's potential bankruptcy, Browning did not complete the transaction (payment, etc.) by 3 April. Therefore, Coastal demanded that Browning return the inventory not later than 20 April.

But, on 16 April, Young, for Coastal, signed a voluntary Chapter 11 bankruptcy petition, which was filed on 22 April. Coastal advised its creditors that bankruptcy had become necessary because all of them had not accepted its proposed workout plan. Coastal owed in excess of $8.5 million to Westinghouse, and

approximately $8 million to other creditors. Browning was Coastal's largest unsecured creditor.

A week after filing its petition, Coastal initiated an adversary proceeding against Browning, seeking an order both enjoining it from disposing of the returned-inventory and directing its transfer to Coastal. Coastal also claimed conversion; interference with contracts and/or business relationships because of Browning's failure to return inventory; punitive damages; and violation of the automatic stay.

The complaint did not specify the amount of damages sought, and there were no allegations that Browning's actions caused the failure of Coastal's pre-bankruptcy workout plan. (Concerning this critical point for judicial estoppel purposes, discussed *infra*, Coastal's bankruptcy attorney testified at a bankruptcy hearing seven years later that *the primary purpose of the adversary proceeding was the inventory-return.*)

Shortly after the adversary proceeding was filed, the bankruptcy court found that Browning had violated the automatic stay and ordered the inventory returned to Coastal; the other claims were not addressed. Browning completed the inventory-return before the end of May.

Soon thereafter, on 6 June, Wayne Duke, Coastal's CEO, executed sworn bankruptcy schedules for Coastal. But, although he believed that Coastal had claims of up to $10 million against Browning, they were *not* disclosed in the bankruptcy schedules and statement of financial affairs. And, although Coastal's $1.3

million debt to Browning was listed in the schedule of liabilities, it was *not* specified as contingent, disputed, or subject to setoff.

Three months later, on 9 September, in moving for relief from the automatic stay so that it could foreclose on Coastal's assets, Westinghouse (secured lender) asserted that it was owed in excess of $8 million by Coastal; that this debt was nearly equal to the value of the collateral; and that reorganization was not possible. On 18 September, Westinghouse and Coastal submitted in support of the lift-stay motion a stipulation, prepared by Westinghouse, that included estimates of the value of Coastal's assets, including that its general intangible assets consisted of computer software programs, customer lists, and vendor lists, with a total worth less than $20,000. *No mention was made of any claims against Browning*. The stipulation showed more than a $5 million shortfall between the value of Coastal's assets and its debt to Westinghouse.

Browning withdrew its objection to lifting the stay. On 19 September, the day after the stipulation was filed, Westinghouse's lift-stay motion was granted; it foreclosed on Coastal's assets, conducting an auction on 7 October. *No mention of Coastal's claims against Browning was made in the foreclosure notices or advertisements, or at the auction*.

A Browning representative attended the auction and bid on the inventory. The highest bid on Coastal's general intangibles (*which, again, were not described as including its claims against Browning*) was $2,000. Westinghouse was the successful bidder, purchasing the assets for $3.25 million.

On 8 October, the day after the auction, and pursuant to negotiations the preceding month prior to executing the lift-stay stipulation, Westinghouse entered into a consignment agreement with Industrial Clearinghouse, Inc. (IC), to sell the assets Westinghouse had purchased at the auction. IC had been formed by Coastal's CEO, Duke, who was also IC's CEO; that same day, all of Coastal's employees became IC employees; and it used the same computer software and customer lists that had been used by Coastal.

In February 1987, IC purchased the remaining Coastal assets from Westinghouse for $1.24 million. Those assets expressly included the previously undisclosed "potential cause of action against Browning".

The Chapter 11 reorganization was converted to a Chapter 7 liquidation that April. After the Trustee filed a no-asset report and applied for closing the bankruptcy case, it was closed in February 1988.

But, the case was re-opened that March, to address issues unrelated to Browning. That April, after IC advised the Trustee that it wanted the claims against Browning prosecuted, and the Trustee refused, because a successful conclusion would benefit only IC, IC advised it would pursue the adversary proceeding. In October 1988, IC was substituted for Coastal in the long dormant (since May 1986) adversary proceeding against Browning.

IC filed its first amended complaint in March 1989, alleging that Browning's breach of the return-inventory agreements and return-delay caused Coastal's bankruptcy and demise; and asserting

- 7 -

claims for breach of contract, conversion, interference with contracts and/or business relationships, fraud, and violation of the automatic stay. A second amended complaint was filed in late 1989; a third, in early 1992.

In September 1992, the Trustee again moved to close the case and for his discharge. IC filed its fourth amended complaint that December.

The adversary proceeding was set for trial in May 1993 in the district court, which had withdrawn the reference from the bankruptcy court. But, on the eve of trial, the Trustee moved to intervene, claiming that Coastal's bankruptcy estate owned the claims being pursued against Browning. The district court referred the case to the bankruptcy court for the ownership determination.

In bankruptcy court, Browning asserted, *inter alia*, that, based on Coastal's nondisclosure in its bankruptcy schedules and the lift-stay stipulation, IC and the Trustee were equitably *and* judicially estopped. Regarding judicial estoppel, IC responded that the claims had been omitted through counsel's oversight.

Following a July 1993 hearing, the bankruptcy court ruled that the estate owned the tort claims; IC, those in contract. Contemporaneously, IC and the Trustee agreed to share any recovery against Browning, with IC to receive 85 percent.

In May 1994, following a hearing that January, the bankruptcy court approved the Trustee/IC (plaintiffs) sharing agreement and, *inter alia*, rejected judicial estoppel. Browning appealed to the district court, which affirmed; and to our court, which affirmed

approval of the sharing agreement, but dismissed Browning's appeal as to judicial estoppel, holding that the ruling was interlocutory. (Most unfortunately, Browning did *not* seek certification from the district court that, pursuant to 28 U.S.C. § 1292(b), the judicial estoppel ruling "involve[d] a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation".)

At trial in district court in early 1996 (ten years after the adversary proceeding was filed), the jury found against plaintiffs' fraud claim; but, *inter alia*, awarded them $5 million for breach of contract, $2.5 million for conversion, $1.75 million for breach of fiduciary duty, $1.3 million for tortious interference, and $7.5 million in punitive damages.

Browning's new trial motion was denied; its motion for judgment as a matter of law, granted in part. The court found insufficient evidence for breach of fiduciary duty; ordered plaintiffs to elect a recovery from among the three remaining substantive awards; reduced punitive damages to $4 million; granted Browning a $1.4 million setoff; denied its motion to set aside the bankruptcy court's judicial estoppel ruling; and limited prejudgment interest.

Plaintiffs elected, under protest, to recover for breach of contract (concomitantly, no punitive damages). The final judgment awarded damages of $3.6 million ($5 million for contract breach

less $1.4 million setoff), and $1.6 million for attorney's fees and costs.

## II.

Among numerous issues presented, Browning claims judicial estoppel, except for the tortious interference claim. Plaintiffs cross-appeal. We hold that plaintiffs are judicially estopped, except for the interference claim; it is time-barred.

### A.

Although we are the second court to review the bankruptcy court's judicial estoppel ruling, we review it "as if this were an appeal from a trial in the district court". *Phoenix Exploration, Inc. v. Yaquinto (Matter of Murexco Petroleum, Inc.)*, 15 F.3d 60, 62 (5th Cir. 1994). Because judicial estoppel is an equitable doctrine, and the decision whether to invoke it within the court's discretion, we review for abuse of discretion the bankruptcy court's rejection of the doctrine. *See, e.g., Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996).

"[A]n abuse of discretion standard does not mean a mistake of law is beyond appellate correction", because "[a] district court by definition abuses its discretion when it makes an error of law". *Koon v. United States*, 518 U.S. 81, 100 (1996). Accordingly, "[t]he abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions". *Id*. *See also Latvian Shipping Co. v. Baltic Shipping Co.*, 99 F.3d 690, 692 (5th Cir. 1996) ("We will not find an abuse of discretion unless the district court's factual findings are clearly erroneous

or incorrect legal standards were applied"); *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 535 (5th Cir. 1996) (court "abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence").

Because judicial estoppel was raised in the context of a bankruptcy case, involving Coastal's express duty under the Bankruptcy Code to disclose its assets, we apply federal law. *See Johnson v. Oregon Dept. of Human Resources*, 141 F.3d 1361, 1364 (9th Cir. 1998) (action under Americans with Disabilities Act; "[f]ederal law governs the application of judicial estoppel in federal courts").

Judicial estoppel is "a common law doctrine by which a party who has assumed one position in his pleadings may be estoped from assuming an inconsistent position". *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988).[1]  The purpose of the doctrine is "to protect the integrity of the judicial process", by "prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self interest". *Id*. (internal quotation

---

[1]*See also **Data General Corp. v. Johnson**, 78 F.3d 1556, 1565 (Fed. Cir. 1996) ("The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed"); **Reynolds v. Commissioner of Internal Revenue**, 861 F.2d 469, 472-73 (6th Cir. 1988) (internal quotation marks and citations omitted) ("Courts have used a variety of metaphors to describe the doctrine, characterizing it as a rule against playing fast and loose with the courts, blowing hot and cold as the occasion demands, or having one's cake and eating it too.  Emerson's dictum that a foolish consistency is the hobgoblin of little minds cuts no ice in this context").

marks, parentheses, and citation omitted).[2] Because the doctrine is intended to protect the judicial system, *rather than the litigants*, detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary. *See **Matter of Cassidy***, 892 F.2d 637, 641 & n.2 (7th Cir.), *cert. denied*, 498 U.S. 812 (1990).[3]

"The policies underlying the doctrine include preventing internal inconsistency, precluding litigants from playing fast and loose with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment." ***United States v. McCaskey***, 9 F.3d 368, 378 (5th Cir. 1993). The doctrine is generally applied where "intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum

---

[2] *See also **United States v. McCaskey***, 9 F.3d 368, 379 (5th Cir. 1993) (purpose of doctrine is "to protect the integrity of the judicial process and to prevent unfair and manipulative use of the court system by litigants"), *cert. denied*, 511 U.S. 1042 (1994); ***McNemar v. Disney Store, Inc.***, 91 F.3d 610, 616 (3d Cir. 1996) ("The doctrine of judicial estoppel serves a consistently clear and undisputed jurisprudential purpose: to protect the integrity of the courts."), *cert. denied*, 519 U.S. 1115 (1997); ***Matter of Cassidy***, 892 F.2d 637, 641 (7th Cir.), *cert. denied*, 498 U.S. 812 (1990) ("Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process"); ***Reynolds***, 861 F.2d at 472 (internal quotation marks and citation omitted) ("The purpose of the doctrine is to protect the courts from the perversion of judicial machinery").

[3] *See also **McNemar***, 91 F.3d at 617 (rejecting contention that party seeking estoppel must show that it would be prejudiced unless opponent is estopped); ***Ryan Operations G.P. v. Santiam-Midwest Lumber Co.***, 81 F.3d 355, 360 (3d Cir. 1996) ("While privity and/or detrimental reliance are often present in judicial estoppel cases, they are not required"); ***Data General***, 78 F.3d at 1565; ***Fleck v. KDI Sylvan Pools, Inc.***, 981 F.2d 107, 121-22 (3d Cir. 1992), *cert. denied*, 507 U.S. 1005 (1993).

provided for suitors seeking justice". ***Scarano v. Central R. Co.***, 203 F.2d 510, 513 (3d Cir. 1953).[4]

Most courts have identified at least two limitations on the application of the doctrine:  (1) it may be applied only where the position of the party to be estopped is clearly inconsistent with its previous one; and (2) that party must have convinced the court to accept that previous position.  *See* ***United States for use of American Bank v. C.I.T. Construction Inc. of Tex.***, 944 F.2d 253, 258 (5th Cir. 1991) ("The 'judicial acceptance' requirement minimizes the danger of a party contradicting a court's determination based on the party's prior position and, thus, mitigates the corresponding threat to judicial integrity"); ***Matter of Cassidy***, 892 F.2d at 641; ***Folio v. City of Clarksburg, W.V.,*** 134 F.3d 1211, 1217-18 (4th Cir. 1998).[5]

---

[4]*See also* ***Taylor v. Food World, Inc.***, 133 F.3d 1419, 1422 (11th Cir. 1998) (internal quotation marks and citation omitted) ("Judicial estoppel is applied to the calculated assertion of divergent sworn positions ... and is designed to prevent parties from making a mockery of justice by inconsistent pleadings"); ***Ryan***, 81 F.3d at 358 ("The basic principle ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory").  "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." ***Davis v. Wakelee***, 156 U.S. 680, 689 (1895).

[5]*Cf*. ***McNemar***, 91 F.3d at 617 (rejecting contention that party seeking estoppel must show that prior statement was accepted by a judicial tribunal); ***Ryan***, 81 F.3d at 361 (doctrine of judicial estoppel contains no requirement that "a party must have benefitted from her prior position in order to be judicially estopped from subsequently asserting an inconsistent one"; but, obviously, "threat to the integrity of the judicial process from subsequent assertion of an incompatible position is more immediate" when tribunal has acted in reliance on party's initial assertion).

The Sixth Circuit has explained that the "judicial acceptance" requirement "does not mean that the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits. Rather, judicial acceptance means only that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition". *Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 473 (6th Cir. 1988).

Some courts have imposed additional requirements. For example, the Fourth Circuit holds that the position must be one of fact instead of law. *Folio*, 134 F.3d at 1217-18. *Contra*, *Matter of Cassidy*, 892 F.2d at 642 ("the change of position on the legal question is every bit as harmful to the administration of justice as a change on an issue of fact").

And, many courts have imposed the additional requirement that the party to be estopped must have acted intentionally, *not* inadvertently. *E.g.*, *Johnson*, 141 F.3d at 1369 ("If incompatible positions are based not on chicanery, but only on inadvertence or mistake, judicial estoppel does not apply"); *Folio*, 134 F.3d at 1217-18; *McNemar v. Disney Store, Inc.*, 91 F.3d 610, 618 (3d Cir. 1996) (internal quotation marks and citation omitted) (part of threshold inquiry for application of judicial estoppel is whether party to be estopped "assert[ed] either or both of the inconsistent positions in bad faith-*i.e.*, with intent to play fast and loose with the court"); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358, 362 (3d Cir. 1996) (internal quotation marks

and citation omitted) (judicial estoppel doctrine "not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing fast and loose with the courts"; doctrine "does not apply when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court"; inconsistency "must be attributable to intentional wrongdoing"); *Matter of Cassidy*, 892 F.2d at 642 (judicial estoppel should not be applied "where it would work an injustice, such as where the former position was the product of inadvertence or mistake"); *Johnson Serv. Co. v. TransAmerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973) (applying Texas law on judicial estoppel; "the rule looks toward cold manipulation and not an unthinking or confused blunder").

Browning maintains that, because of the nondisclosure in Coastal's bankruptcy schedules and its lift-stay stipulation, plaintiffs, as Coastal's successors, are judicially estopped (except for the tortious interference claim).

Despite the undisputed facts that Coastal was aware of, but did not disclose, the claims, the bankruptcy court rejected judicial estoppel, stating that, from the inception of Coastal's adversary proceeding, Browning, the Trustee, and Westinghouse were aware of that action. That statement, however, is in the section of the opinion addressing *equitable estoppel* (which, of course, requires detrimental reliance; that defense is no longer at issue). Because the nondisclosure is not discussed in the part on judicial estoppel, it is unclear whether, in rejecting such estoppel, the

court relied on the parties' awareness of the adversary proceeding.

With respect to the lift-stay stipulation, the bankruptcy court noted that it was prepared by Westinghouse's attorneys and reviewed by Coastal's attorney, who "checked it with his client for accuracy" when it was signed. The court stated that Westinghouse and Coastal's attorneys "overlooked" the adversary proceeding in arriving at the $20,000 figure for Coastal's general intangibles; but ruled that it was not their "intent to omit mention of the Browning lawsuit"; and concluded that "[s]uch omission appears to have been inadvertent, as opposed to any outright conspiracy, or intentional self-contradiction being used as a means to obtain unfair advantage". In this regard, the court concluded that the lift-stay stipulation was not intended to be an "exhaustive listing of assets".

The bankruptcy court found that when the stipulation was signed and the stay lifted, Duke, Coastal's CEO and later IC's, believed that Browning's actions had damaged Coastal in the $10 million range. The bankruptcy court stated that "[i]t appears that such lawsuit did have value, but such value did not approach the projected deficiency of approximately $5 million that [Westinghouse] anticipated would exist after" it sold Coastal's assets.

Accordingly, the bankruptcy court held that Coastal's tort claims were not foreclosed upon and were not affected by judicial estoppel. Likewise, the court concluded that there was "insufficient factual or legal justification to show that [IC]

- 16 -

should be judicially estopped ... from asserting ... contract claims of Coastal ... [greater than] $20,000"; and that there was insufficient proof that Coastal, IC, or Westinghouse participated in a fraud on the court or creditors with respect to listing assets on Coastal's schedules, the lift-stay stipulation, or lifting the stay.

On appeal, the district court summarily "agree[d] with the Bankruptcy Court's findings [, especially concerning inadvertence,] and [held] that judicial estoppel should not be applied".

It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, *including contingent and unliquidated claims*. 11 U.S.C. § 521(1) ("The debtor shall–(1) file a list of creditors, and unless the court orders otherwise, a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs"). "The duty of disclosure in a bankruptcy proceeding is a continuing one, and a debtor is required to disclose all potential causes of action". ***Youngblood Group v. Lufkin Fed. Sav. & Loan Ass'n***, 932 F. Supp. 859, 867 (E.D. Tex. 1996). "'The debtor need not know all the facts or even the legal basis for the cause of action; rather, if the debtor has enough information ... prior to confirmation to suggest that it may have a possible cause of action, then that is a "known" cause of action such that it must be disclosed'". ***Id***. (brackets omitted; quoting ***Union Carbide Corp. v. Viskase Corp. (In re Envirodyne Indus., Inc.)***, 183 B.R. 812, 821 n.17 (Bankr. N.D.

Ill. 1995)).  "*Any claim with potential must be disclosed*, even if it is 'contingent, dependent, or conditional'".  **Id**. (quoting **Westland Oil Dev. Corp. v. MCorp Management Solutions, Inc.**, 157 B.R. 100, 103 (S.D. Tex. 1993)) (emphasis added).

Viewed against the backdrop of the bankruptcy system and the ends it seeks to achieve, the importance of this disclosure duty cannot be overemphasized. *See generally* **Oneida Motor Freight, Inc. v. United Jersey Bank**, 848 F.2d 414 (3d Cir.) (discussing importance of disclosure to creditors and to bankruptcy court), *cert. denied*, 488 U.S. 967 (1988).

> The rationale for ... decisions [invoking judicial estoppel to prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy] is that the *integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets*. The courts will not permit a debtor to obtain relief from the bankruptcy court by representing that no claims exist and then subsequently to assert those claims for his own benefit in a separate proceeding. *The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements, and the bankruptcy court, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure provided by the debtor is incomplete.*

**Rosenshein v. Kleban**, 918 F. Supp. 98, 104 (S.D.N.Y. 1996) (emphasis added).[6]

---

[6]*See also* **Ryan**, 81 F.3d at 362 ("disclosure requirements are crucial to the effective functioning of the federal bankruptcy system"); **Louden v. Federal Land Bank of Louisville (In re Louden)**, 106 B.R. 109, 112 (Bankr. E.D. Ky. 1989) ("[w]ithout ... disclosure [required by 11 U.S.C. § 521], the basic system of marshalling of assets and the resulting distribution of proceeds to creditors

As Coastal's bankruptcy attorney admitted at the July 1993 bankruptcy court hearing, it is very important that a debtor's bankruptcy schedules and statement of affairs be as accurate as possible, because that is the initial information upon which all creditors rely. The significance of the undisclosed claims was underscored by the testimony of Westinghouse's counsel at that same hearing. When asked why the claims against Browning were not included with the assets described in the lift-stay stipulation, he testified that it was not intended to be an exhaustive list of Coastal's assets; that, in order to determine Coastal's assets, creditors should have looked instead at, *inter alia*, Coastal's schedules and statement of financial affairs. (Of course, such claims/assets were not there disclosed.)

Courts in numerous cases have precluded debtors or former debtors from pursuing claims about which the debtors had knowledge, but did not disclose, during the debtors' bankruptcy proceedings. *See, e.g.*, ***Payless Wholesale Distributors, Inc. v. Alberto Culver (P.R.) Inc.***, 989 F.2d 570 (1st Cir.), *cert. denied*, 510 U.S. 931 (1993); ***Oneida***, 848 F.2d 414.[7] It is along this line that Browning

would be an impossible task").

[7]*See also* ***Chandler v. Samford University***, 35 F. Supp. 2d 861 (N.D. Ala. 1999); ***Youngblood Group***, 932 F. Supp. 859; ***Rosenshein***, 918 F. Supp. 98; ***Okan's Foods, Inc. v. Windsor Associates Ltd. Partnership (In re Okan's Foods, Inc.)***, 217 B.R. 739 (Bankr. E.D. Pa. 1998); ***Welsh v. Quabbin Timber, Inc.***, 199 B.R. 224 (D. Mass. 1996); ***Freedom Ford, Inc. v. Sun Bank & Trust Co. (Matter of Freedom Ford)***, 140 B.R. 585 (Bankr. M.D. Fla. 1992); ***State of Ohio, Dept. of Taxation v. H.R.P. Auto Center, Inc. (In re H.R.P. Auto Center, Inc.)***, 130 B.R. 247 (Bankr. N.D. Ohio 1991); ***Sure-Snap Corp. v. Bradford Nat'l Bank***, 128 B.R. 885 (D. Vt.), *aff'd*, 948 F.2d 869 (2d Cir. 1991); ***Pako Corp. v. Citytrust***, 109 B.R. 368 (D.

- 19 -

takes its stand.  It maintains that the bankruptcy court applied an incorrect standard of law and, therefore, abused its discretion; that, rather than basing its decision on lack of knowledge *vel non*, the court improperly based it on self-serving claims of lack of intent to conceal.  Browning maintains that "inadvertence" should preclude judicial estoppel only when the inconsistent positions result from a lack of knowledge.  We need not agree entirely with Browning's contention, in order to conclude, as discussed below, that the bankruptcy court abused its discretion.

1.

Plaintiffs respond that the first judicial estoppel prong (inconsistent positions) is not satisfied, because Coastal

---

Minn. 1989); *Louden*, 106 B.R. 109; *Hoffman v. First Nat'l Bank of Akron, IA (In re Hoffman)*, 99 B.R. 929 (N.D. Iowa 1989); *Galerie Des Monnaies of Geneva v. Deutsche Bank, A.G. (In re Galerie Des Monnaies of Geneva, Ltd.)*, 55 B.R. 253 (Bankr. S.D.N.Y. 1985), *aff'd*, 62 B.R. 224 (S.D.N.Y. 1986).  *Cf*. *Donaldson v. Bernstein*, 104 F.3d 547 (3d Cir. 1997) (debtors' principals judicially estopped from asserting that one of them had terminated relationship with debtor because debtor did not disclose alleged resignation prior to bankruptcy court's approval of plan of reorganization); *Cullen Center Bank & Trust v. Hensley (Matter of Criswell)*, 102 F.3d 1411 (5th Cir. 1997) (Chapter 7 trustee judicially estopped from asserting that creditor was not transferee of oil and gas properties that debtor fraudulently conveyed to children, because trustee succeeded in preference action based on assertion that creditor's lien was a transfer); *Eubanks v. F.D.I.C.*, 977 F.2d 166 (5th Cir. 1992) (res judicata effect of order confirming plan of reorganization barred debtors from asserting undisclosed claims); *County Fuel Co., Inc. v. Equitable Bank Corp.*, 832 F.2d 290 (4th Cir. 1987) (debtor's failure to assert breach of contract counterclaim to proof of claim filed by creditor barred subsequent breach of contract action against creditor based on "principles of waiver closely related to those that, in the interests of repose and integrity, underlie res judicata"); *United Virginia Bank/Seaboard Nat'l v. B.F. Saul Real Estate Investment Trust*, 641 F.2d 185 (4th Cir. 1981) (creditor judicially estopped from litigating issue based on earlier inconsistent position in bankruptcy proceedings).

fulfilled its duty to disclose its claims against Browning by initiating the adversary proceeding in April 1986, a week after filing its Chapter 11 petition.  According to plaintiffs, the subsequent nondisclosure was inconsequential because, in the light of the adversary proceeding, everyone involved in the bankruptcy proceeding, including Browning, was aware of the claims.

a.

The record contradicts that assertion; Browning, Westinghouse, and Coastal's bankruptcy counsel all believed that, after Browning returned the inventory in May 1986, little remained of the adversary proceeding.  Coastal's bankruptcy attorney testified at the July 1993 bankruptcy court hearing that the primary purpose of the adversary proceeding was to cause that inventory return.  The attorney who represented Westinghouse in connection with lifting the stay testified similarly that Coastal's claims against Browning were not mentioned in the lift-stay stipulation, during the lift-stay hearing, in the notice of the auction, or at the auction because Westinghouse believed that the claims sought inventory turnover from Browning, which had already been accomplished; and that there was little left to be done in that adversary proceeding.  Likewise, at a bankruptcy hearing in January 1994, Browning's attorney testified that inventory turnover was the essence of the adversary proceeding.

In the light of that consensus, it was particularly important for Duke (Coastal) to disclose his vastly different view:  that the claims were worth millions.  In sum, this silence led Browning, the

- 21 -

other creditors, and the bankruptcy court to believe that Coastal's claims against Browning were resolved in May 1986, when it returned the inventory.

b.

Moreover, *Browning's knowledge of the claims*, or its non-reliance on the nondisclosure, even if supported by the record, are irrelevant.  As discussed *supra*, unlike the well-known reliance element for other forms of estoppel, such as equitable estoppel, detrimental reliance by the party seeking *judicial estoppel* is *not* required.  Again, the purpose of *judicial estoppel* is *not* to protect the litigants; it is to protect the integrity of the judicial system.[8]

Accordingly, the inconsistent positions prong for judicial estoppel is satisfied.  By omitting the claims from its schedules and stipulation, Coastal represented that none existed.  Likewise, in scheduling its debt to Browning, Coastal did *not* specify that it was disputed, contingent, or subject to setoff.  But in this proceeding, plaintiffs have asserted claims for $10 million against Browning for allegedly causing Coastal's bankruptcy and demise.

2.

Plaintiffs do not seriously dispute that the second prong for judicial estoppel (acceptance of Coastal's first position by the bankruptcy court) is satisfied.  The stay was lifted based in part

---

[8]Even if detrimental reliance were an element, there is evidence that Browning relied on the no-claims-existed representations in withdrawing its objection to lifting the stay and in not bidding at the auction on Coastal's intangible assets.

- 22 -

on the stipulation, which represented that Coastal's intangible assets were worth less than $20,000; and that its assets were inadequate to satisfy its debt to Westinghouse.

3.

Nevertheless, plaintiffs maintain that judicial estoppel is inapplicable because the nondisclosure was unintentional and inadvertent. On this record, plaintiffs' and the bankruptcy court's reliance on inadvertence to preclude judicial estoppel is misplaced. Therefore, the court abused its discretion.

Our review of the jurisprudence convinces us that, in considering judicial estoppel *for bankruptcy cases*, the debtor's failure to satisfy its statutory disclosure duty is "inadvertent" only when, in general, the debtor either lacks knowledge of the undisclosed claims *or* has no motive for their concealment.[9]

---

[9]*See, e.g.*, **Brassfield v. Jack McLendon Furniture, Inc.**, 953 F. Supp. 1424 (M.D. Ala. 1996) (in Chapter 7 case, where claims accrued after filing petition, and where debtor was *not* aware of claims during bankruptcy, debtor not judicially estopped from asserting unscheduled claims); **Dawson v. J. G. Wentworth & Co., Inc.**, 946 F. Supp. 394 (E.D. Pa. 1996) (although debtor disclosed claim in amended bankruptcy schedules, fact issue regarding debtors' good or bad faith in not disclosing claims in original bankruptcy schedules precluded summary judgment based on judicial estoppel); **Richardson v. United Parcel Serv.**, 195 B.R. 737 (E.D. Mo. 1996) (judicial estoppel inapplicable for undisclosed claim where debtor's bankruptcy case was still pending, assets had not been distributed, and no plan had been confirmed); **In re Envirodyne Industries, Inc.**, 183 B.R. 812 (where retention of jurisdiction in plan of reorganization put creditors on notice as to possibility of such actions, and debtor's undisclosed counterclaim did *not* assert position contrary to listing of creditor's claim as undisputed, judicial estoppel did not bar debtor from pursuing counterclaim and setoff request); **Elliott v. ITT Corp.**, 150 B.R. 36 (N.D. Ill. 1992) (where debtor was unaware that claim against creditor existed, and amended schedule after discovery of potential claims, judicial estoppel inapplicable); **Neptune World Wide Moving, Inc. v. Schneider Moving & Storage Co. (In re Neptune World Wide Moving,**

- 23 -

Two cases from the Third Circuit aptly illustrate the critical distinction between nondisclosures based on a lack of knowledge, and those where, as here, the debtor fails to satisfy its disclosure duty despite knowledge of the undisclosed facts. In *Oneida*, 848 F.2d 414, judicial estoppel barred a former Chapter 11 debtor from prosecuting against a bank claims not disclosed during the bankruptcy proceedings. The excuse for nondisclosure was *not* lack of knowledge; instead, that the bankruptcy case was never in a procedural posture for the claims to be properly asserted. *Id*. at 418. Although the court stopped short of holding that the nondisclosure was equivalent to taking a position that the claims did not exist, it concluded that the debtor's acknowledgment of its debt to the bank, without any indication that the debt was disputed or subject to setoff (as is the situation here), constituted a position inconsistent with its later action against the bank. *Id*. at 419.

On the other hand, in *Ryan*, 81 F.3d 355, the Third Circuit concluded that a Chapter 11 debtor's earlier nondisclosure would not judicially estop the debtor from pursuing the claims outside of bankruptcy, because there was no evidence that the debtor acted in bad faith. *Id*. at 362. The debtor, a builder, asserted claims against the manufacturers and suppliers of an allegedly defective

---

*Inc.)*, 111 B.R. 457 (Bankr. S.D.N.Y. 1990) (fact issue regarding debtor's contention that defendants concealed and altered documents which prevented debtor from discovering and disclosing preferential or fraudulent transfer claims in disclosure statement precludes dismissal based on judicial estoppel).

product; but it had not listed any potential claims regarding the product in its bankruptcy schedules.

The court distinguished *Oneida* on the ground that the debtor there not only failed to disclose its potential claim as a contingent asset, but also scheduled its debt as a liability, without disclosing an offset possibility. *Id*. at 363. The court stated that the *Oneida* debtor had knowledge of its claim when it filed for bankruptcy because the "gravamen of [its] case against the bank was that the bank's actions were responsible for forcing [the debtor] into bankruptcy", *id*.; and noted that the *Oneida* debtor had a motive to conceal the claim because, had the bank known that the debtor would seek restitution of the amount paid to the bank under the plan, the bank "might well have voted against approval of the plan". *Id*. The *Ryan* court concluded that, in *Oneida*, it was "[t]his combination of knowledge of the claim and motive for concealment in the face of an affirmative duty to disclose [that] gave rise to an inference of intent sufficient to satisfy the [bad faith] requirements of judicial estoppel". *Id*. at 363.

In contrast, the court stated that there was no basis for inferring that the *Ryan* debtor "deliberately asserted inconsistent positions in order to gain advantage", *id*. at 363, because there was "no evidence that the nondisclosure played any role in the confirmation of the plan or that disclosure of the potential claims would have led to a different result", *id*.; and the debtor's failure to list claims against the manufacturers and suppliers as

contingent assets was offset by its failure to list, as contingent liabilities, claims asserted against the debtor by homeowners for the defective product. *Id*. The court also noted that the debtor would derive no appreciable benefit from the nondisclosure, because creditors would receive 91 percent of any recovery on the claims, *id.*; and that the debtor's actions subsequent to filing its schedules, including obtaining authorization from the bankruptcy court to pursue the claims, were inconsistent with an intent to deliberately conceal them. *Id*. at 364. The court concluded that intent to mislead or deceive could not be inferred from the mere fact of nondisclosure. *Id*. at 364-65.

In *Okan's Foods, Inc. v. Windsor Associates Ltd. Partnership (In re Okan's Foods, Inc.)*, 217 B.R. 739 (Bankr. E.D. Pa. 1998), the bankruptcy court held that the "bad faith" element mandated by *Ryan* was satisfied by "[s]tatements or conduct of the debtor evincing a reckless disregard for the truth". *Id*. at 755. There, a Chapter 11 debtor, following plan confirmation, filed an adversary complaint against its creditor-landlord, asserting claims under 42 U.S.C. § 1983, and alleging that the creditor's actions caused its bankruptcy. The court found that, because "the undisclosed claim involved allegations that a particular creditor's conduct precipitated the filing of the bankruptcy case and that substantial damage to its business occurred as a result ..., all of the facts underlying the claims were available and known to the debtor well before confirmation", *id*. at 756, and inferred that the debtor's motive for the pre-confirmation nondisclosure was "to

preserve for its own uses, to the exclusion of its creditors, any recovery it might obtain upon a successful prosecution of such claim". *Id*.

Coastal's claimed "inadvertence" is not the type that precludes judicial estoppel against plaintiffs, as Coastal's successors, from asserting in the instant litigation the previously nondisclosed claims; Coastal both knew of the facts giving rise to its inconsistent positions, *and* had a motive to conceal the claims.

It is undisputed that Duke, who, as Coastal's CEO, signed Coastal's schedules, then believed that Coastal had claims for $10 million against Browning. And, as found by the bankruptcy court, he continued to maintain that belief when he authorized Coastal's attorney to execute the lift-stay stipulation. At the July 1993 bankruptcy hearing, when asked why he did not disclose those claims on Coastal's schedules, Duke responded that "[w]e pretty much relied on our attorneys. We had no experience in filling those out, and we provided them the information, and maybe later on during the process, ... a couple of months down the road we may have filled them out ourselves.... We went to [a] library and tried to find books on how to fill these forms out...." He testified further: "[W]e had never done these kind of statements before, and we depended upon our legal counsel ... about these types of things, and he had kind of a check list for us.... [W]e depended upon [him] to give us the guidance on what to put...." Finally, Duke testified that he did not know what "contingent" and "unliquidated" claims meant under bankruptcy law; that Coastal's

counsel told him "what to put" on the schedules; that it was counsel's conclusion that "there was no value" in the claims against Browning; and that, if there was an error, it was "just an oversight".

But, at that July 1993 hearing, Coastal's bankruptcy attorney testified that the adversary proceeding against Browning was a contingent or unliquidated claim that should have been included on Coastal's schedules; and conceded that Coastal's debt to Browning "probably" should have been listed as being disputed. Although the attorney testified that it was his firm's policy to discuss schedules with clients, he did not recall his specific involvement in preparing the schedules, could *not* recall any discussions with Young or Duke about the claims against Browning, and could *not* testify as to why the adversary proceeding was *not* listed as a contingent or unliquidated claim.

Duke's claimed lack of awareness of Coastal's statutory disclosure duty for its claims against Browning is not relevant. *See Chandler v. Samford University*, 35 F. Supp. 2d 861, 865 (N.D. Ala. 1999) ("Research reveals no case in which a court accepted such an excuse for a party's failure to comply with the requirement of full disclosure"). In any event, no one testified that Coastal's bankruptcy attorney advised Coastal *not* to disclose the claims.

Moreover, Coastal had a motive for concealing them. Had those claims, believed to be worth $10 million (more than enough to satisfy Coastal's debt to Westinghouse) been disclosed, Coastal's

unsecured creditors might have opposed lifting the stay, and the bankruptcy court might have reached a different decision in that regard. Or, even had the stay been lifted, creditors, including Browning, might have chosen to bid more at the foreclosure auction for Coastal's assets. Browning's representative at the auction testified that, had Browning been aware that Coastal's claims against it were then being sold, he "strongly suspect[ed]" that Browning would have authorized him to bid on them.

Coastal avoided paying its debts by filing bankruptcy. Yet IC, formed by Coastal's CEO, purchased Coastal's assets, including the undisclosed $10 million claim against Browning, for only $1.24 million, and continued to sell Browning's former inventory at discounted prices, then obtained a net judgment of $3.6 million against Browning on the undisclosed claims. For facts similar to those at hand, the bankruptcy court's interpretation of the "inadvertence" exception for judicial estoppel would encourage bankruptcy debtors to conceal claims, write off debts, purchase debtor assets at bargain prices, and then sue on undisclosed claims and possibly recover windfalls. This, of course, would be to the detriment of creditors who decided not to bid on the debtor's assets at a foreclosure sale because they lacked knowledge about the existence or value of the undisclosed claims.

Needless to say, judicial estoppel is intended to prevent just such a process. As the First Circuit aptly stated in *Payless*:

> The basic principle of bankruptcy is to obtain
> a discharge from one's creditors in return for
> all one's assets, except those exempt, as a
> result of which creditors release their own

claims and the bankrupt can start fresh. Assuming there is validity in [debtor's] present suit, it has a better plan. Conceal your claims; get rid of your creditors on the cheap, and start over with a bundle of rights. This is a palpable fraud that the court will not tolerate, even passively. [Debtor], having obtained judicial relief on the representation that no claims existed, can not now resurrect them and obtain relief on the opposite basis.

989 F.2d at 571.

4.

Finally, plaintiffs maintain that judicial estoppel would be inequitable because Browning also took inconsistent positions on issues related to its defense (regarding ownership of the claims and whether they were foreclosed on by Westinghouse). We disagree. Again, the purpose of judicial estoppel is to protect the integrity of courts, not to punish adversaries or to protect litigants.

B.

As noted, the only claim not barred by judicial estoppel is that for tortious interference. Plaintiffs claimed that, around the start of 1986, and but for Browning's interference, Walter Helms would have purchased Coastal for $10 million. Helms testified that Browning's president, Kooyman, told him (Helms) that he had heard Helms was interested in purchasing Coastal; Helms confirmed that he intended to do so; and Kooyman told Helms that "he couldn't divulge certain things that were going on, but it probably would be a good idea if [Helms] held up a little bit".

Browning presents, *inter alia*, a meritorious limitations bar.

1.

- 30 -

Although Coastal raised tortious interference claims against Browning in its original complaint (filed in 1986), and IC did likewise in several of its amended complaints, those claims were premised on Browning's failure to return inventory and its impact on Coastal's relationships with its customers and secured lender (Westinghouse). It was *not* until late December 1993, over seven years after the adversary proceeding was filed, that IC moved for leave to file a fifth amended complaint which, *for the first time*, claimed tortious interference based on the alleged Helms-purchase. That amended complaint was not filed until almost two years later, in 1995. And, plaintiffs subsequently restricted their tortious interference claim to the Helms-purchase.

Under Texas law, a two-year limitations period applies to tortious interference claims, TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a); *First Nat'l Bank of Eagle Pass v. Levine*, 721 S.W.2d 287, 289 (Tex. 1986); and, "[f]or the purposes of application of the statute of limitations, a cause of action generally accrues at the time when facts come into existence which authorize a claimant to seek a judicial remedy.... Put another way, a cause of action can generally be said to accrue when the wrongful act effects an injury". *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990) (internal quotation marks and citation omitted); *see also Computer Associates Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 458 (Tex. 1996) ("The traditional rule in Texas is that a cause of action accrues and the two-year limitations period begins to run as soon as the owner suffers some injury, regardless of when

the injury becomes discoverable"). On the other hand, "[t]he discovery rule exception defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action". *Id.* at 455.

But, the Texas Supreme Court has stated that "[t]he discovery rule, in application, proves to be a very limited exception to statutes of limitations". *Id*. at 455 (internal quotation marks and citation omitted); *see also* **S.V. v. R.V.**, 933 S.W.2d 1, 25 (Tex. 1996) ("exceptions to the legal injury rule should be few and narrowly drawn"). "Generally, application [of the discovery rule] has been permitted in those cases where the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable". **Altai**, 918 S.W.2d at 456 (internal quotation marks and citation omitted).

In seeking judgment as a matter of law, Browning asserted that the interference claim was time-barred. Plaintiffs had to prove applicability of the discovery rule: first, that tortious interference claims are inherently undiscoverable; and second, that their claim is objectively verifiable. *See* **Woods v. William M. Mercer, Inc.**, 769 S.W.2d 515, 518 (Tex. 1988).

a.

Browning contends that the claim is not inherently undiscoverable because the alleged injury is not, by its nature, unlikely to be discovered within the limitations period. Along this line, Browning maintains that Coastal became aware of its

- 32 -

injury when the alleged sale did not materialize; and that, by simply asking Helms, the putative purchaser, Coastal could have discovered the alleged interference.

Plaintiffs counter that the claim was inherently undiscoverable because of the difficulty of learning about secret communications between third parties. They point out that Young, Coastal's former president and chairman, testified that he asked Helms why he wanted to delay purchasing Coastal, and that Helms refused to explain until his January 1993 deposition. Duke testified similarly that, until January 1993, Helms never mentioned why he did not complete the purchase.

"The requirement of inherent undiscoverability recognizes that the discovery rule exception should be permitted only in circumstances where it is difficult for the injured party to learn of the negligent act or omission". *Altai*, 918 S.W.2d at 456 (internal quotation marks and citation omitted). "Inherently undiscoverable encompasses the requirement that the existence of the injury is not ordinarily discoverable, even though due diligence has been used". *Id*. The Texas Supreme Court has stated that "[t]he common thread in [the 'inherently undiscoverable'] cases is that when the wrong and injury were unknown to the plaintiff because of their very nature and not because of any fault of the plaintiff, accrual of the cause of action was delayed". *S.V.*, 933 S.W.2d at 7.

"To be 'inherently undiscoverable,' an injury need not be absolutely impossible to discover, else suit would never be filed

and the question whether to apply the discovery rule would never arise." *Id*. "Nor does 'inherently undiscoverable' mean merely that a particular plaintiff did not discover his injury within the prescribed period of limitations; discovery of a particular injury is dependent not solely on the nature of the injury but on the circumstances in which it occurred and plaintiff's diligence as well". *Id*. "An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence". *Id*.

Helms was listed in October 1989 as an expert witness for plaintiffs, and so testified. There was also evidence that he was a director of IC's parent, Overline Corporation; that he had been paid $50,000 annually as a consultant for Overline; that he had owned ten percent of its stock; and that he was a creditor of IC. Under these circumstances, Helms' failure until his deposition in January 1993 to inform plaintiffs of Browning's alleged interference is inexplicable.

We doubt that tortious interference is the type of conduct that, *by its nature*, is unlikely, despite due diligence, to be discovered within the limitations period. In any event, it is not necessary for us to decide that question. The discovery rule is inapplicable because, as discussed below, the claim is not objectively verifiable.

b.

Browning asserts that the claim is not objectively verifiable because there is no objective or documentary evidence of either

Helms' alleged offer or Browning's alleged interference. Plaintiffs respond, based on Helms' eyewitness account, that the claim is objectively verifiable.

The Texas Supreme Court has stated that "the bar of limitations cannot be lowered for no other reason than a swearing match between parties over facts and between experts over opinions". *S.V.*, 933 S.W.2d at 15. The requirement of objective verifiability requires physical or other evidence, such as an objective eyewitness account, to corroborate the existence of the claim. *See S.V.*, 933 S.W.2d at 15. "Objectively verifiable evidence is the key factor for determining the discovery rule's applicability." *Askanase v. Fatjo*, 130 F.3d 657, 668 (5th Cir. 1997).

There is no documentary evidence of Helms' proposed purchase or Kooyman's alleged comment regarding it. The only evidence concerning Helms' alleged agreement to purchase Coastal is his and Young's testimony; the only evidence concerning interference is Helms' testimony. Kooyman, Browning's president, did *not* testify at trial; his testimony was presented by deposition. And, he was *not* deposed about his alleged interference — his alleged comments to Helms.

As stated, Helms testified as a paid expert witness for plaintiffs, was a creditor of IC, and was a consultant, part owner, and director of IC's parent. He also had other close ties to the Coastal and IC principals: at the time of Helms' testimony, Young was running a company for Helms; and both Young and Duke had served

as expert witnesses for Helms in prior litigation involving one of Helms' companies.

2.

Because the discovery rule does not apply to the interference claim, it is time-barred unless it relates back to the complaints filed within the limitations period.  Rule 15(c) of the Federal Rules of Civil Procedure provides, in pertinent part:

> An amendment of a pleading relates back to the date of the original pleading when
>
> (1)  relation back is permitted by the law that provides the statute of limitations applicable to the action, or
>
> (2)  the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading....

FED. R. CIV. P. 15(c).

"[U]nder Rule 15(c), an amendment to a complaint will relate back to the date of the original complaint if the claim asserted in the amended pleading arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading". *F.D.I.C. v. Conner*, 20 F.3d 1376, 1385 (5th Cir. 1994) (internal quotation marks and citation omitted).

> The theory that animates this rule is that once litigation involving particular conduct or a given transaction or occurrence has been instituted, the parties are not entitled to the protection of the statute of limitations against the later assertion by amendment of defenses or claims that arise out of the same conduct, transaction, or occurrence as set forth in the original pleading.  Permitting such an augmentation or rectification of claims that have been asserted before the

> limitations period has run does not offend the purpose of a statute of limitations, which is simply to prevent the assertion of stale claims.

*Id.* (internal quotation marks and citation omitted).

Browning notes that the tortious interference claim is based on a different transaction than the earlier claims, which are based on Browning's failure to return inventory to Coastal. Plaintiffs counter that the relation-back doctrine applies because Browning had ample notice, after more than seven years of litigation, that plaintiffs were suing on all of Browning's acts that caused Coastal's demise; and that Browning's proposed-purchase interference was merely part of its broader plan to destroy Coastal.

We conclude that the claim does not arise out of the same conduct, transaction, or occurrences presented in the timely-filed complaints. As the district court stated in its post-verdict order:

> All of the claims asserted by plaintiffs revolve around two sets of occurrences. The tortious interference ... claim stems from an attempted sale of Coastal Plains to a third party.... The remaining claims involve the failure of Browning to return inventory to Coastal Plains.

And, in awarding attorney's fees, the district court stated that "[t]he tortious interference claim is not factually interrelated to the other claims as it arose from a separate transaction".

Moreover, plaintiffs' contention that their tortious interference claim is based on the same transaction or occurrence as their other claims is not consistent with positions they have

- 37 -

taken with respect to attorney's fees and Browning's right to setoff.  In seeking attorney's fees, one of plaintiffs' attorneys stated by affidavit:  "*[w]ith the exception of the claim involving tortious interference*, all of the causes of action pled in this case were dependent upon the same set of facts or circumstances".  (Emphasis added.)   In their appellate brief here, plaintiffs contend that Browning's tortious interference caused a separate injury to Coastal; and assert that, if we affirm the judgment solely on the basis of the interference claim, Browning will not be entitled to a setoff because "[t]ortious interference is not sufficiently connected with Browning's claim to permit an offset".

III.

For the foregoing reasons, the judgment is **REVERSED**, and judgment is **RENDERED** in favor of Browning.

***REVERSED and RENDERED***