

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00196-CV

---

NEW HAMPSHIRE INSURANCE COMPANY

APPELLANT

V.

MAGELLAN REINSURANCE COMPANY, LTD.

APPELLEE

----------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION ON REHEARING

----------

Appellant New Hampshire Insurance Company filed a motion for rehearing of our opinion issued February 14, 2013. We deny the motion, withdraw our opinion and judgment dated February 14, 2013, and substitute the following.

## I. INTRODUCTION

The litigation between New Hampshire and Appellee Magellan Reinsurance Company, Ltd. has been lengthy, vigorously contested, and well

traveled. It began in 2004 in the Turks and Caicos Islands (TCI), included brief proceedings in New York, and is now—eight years later, yet still in its infancy—ongoing in Texas. While the essence of the underlying dispute between New Hampshire and Magellan has remained unchanged since the inception of the litigation, New Hampshire's opinion about the arbitrability of the disputed matters has not. Because we hold that New Hampshire is judicially estopped from compelling arbitration, we will affirm the trial court's order denying New Hampshire's motion to compel arbitration.

## II. FACTUAL AND PROCEDURAL BACKGROUND

New Hampshire is a Pennsylvania corporation that is authorized to conduct business in Texas. Magellan is a corporation chartered in the TCI. Its primary place of business is Tarrant County, Texas.

In 1997, New Hampshire and Magellan entered into a "Contractual Reimbursement Insurance Reinsurance Agreement," whereby Magellan agreed to accept 100% of New Hampshire's obligations and liabilities under a number of automobile dealer insurance policies issued by New Hampshire in exchange for 100% of the gross written premiums paid under the policies, less a provisional ceding commission to New Hampshire. The Reinsurance Agreement required Magellan to establish a trust account, from which New Hampshire was authorized to withdraw funds to secure payments under the Reinsurance Agreement. The Reinsurance Agreement also contains an arbitration provision, which provides in relevant part that "[a]ll disputes or differences *arising out of the*

2

*interpretation of this Agreement* shall be submitted" to arbitration in New York. [Emphasis added.]

In April 2002, New Hampshire made "a series of withdrawals" from the trust account—over $2 million according to Magellan—"effectively emptying" it. New Hampshire subsequently informed Magellan that the trust fund required a deposit of approximately $1.2 million. Magellan identified several discrepancies in New Hampshire's claims handling and accounting, disagreed that the deposit was necessary, and requested a refund from New Hampshire in the amount of approximately $995,000. New Hampshire and Magellan continued to exchange correspondence over the next few years—New Hampshire defended its claims handling and accounting and demanded that Magellan deposit approximately $1.4 million into the trust account, and Magellan challenged New Hampshire's claims amounts, demanded to inspect New Hampshire's books and records, and refused to deposit the $1.4 million into the trust account.

Relying upon the demanded but unpaid $1.4 million and a TCI ordinance related to a company's inability to pay a "debt," New Hampshire filed a petition in August 2004 in a TCI court to "wind up" Magellan's business. Magellan responded by moving to stay the proceedings and to compel arbitration. New Hampshire argued against arbitration, contending that the dispute did not involve the interpretation of the Reinsurance Agreement but only whether Magellan was insolvent. The TCI lower court agreed with New Hampshire, declined to compel

3

arbitration, and ordered Magellan to be wound up.  An appeal reversing the lower court, a remand, and additional litigation in the TCI courts ensued.

Meanwhile, at some point before the TCI lower court issued its final ruling, Magellan initiated a proceeding in a New York state court to enjoin the TCI litigation and to compel New Hampshire to arbitration in New York.  New Hampshire contested the action, arguing that Magellan's "statutory insolvency" under TCI law was not a dispute that involved the interpretation of the Reinsurance Agreement.  After the TCI lower court had ruled, the New York court denied Magellan's requested relief, concluding—just like the TCI lower court had—that "[t]he question of whether [Magellan] owes money is not an interpretation of the reinsurance contract; rather, it is a factual controversy concerning respondent's calculation of the amount in dispute . . . ."

In September 2005, while the TCI litigation was still pending, Magellan sued New Hampshire in Texas and asked the trial court to make nine declarations regarding the parties' rights "under the Reinsurance Agreement." Magellan amended its original petition later in September 2005, and with the exception of two declarations, Magellan asked the trial court to make all of the same declarations as those pleaded in the original petition.

In December 2005, New Hampshire filed a motion to dismiss or abate Magellan's Texas action.  New Hampshire argued that the relief was necessary because "[t]he issues Magellan now asks this Court to decide mirror those

4

raised, litigated[,] and currently pending in the TCI . . . Action." The trial court abated the Texas action in February 2006 pending resolution of the TCI litigation.

The TCI litigation came to a conclusion in July 2009 when the Lords of the Judicial Committee of the Privy Council held that New Hampshire was not a "creditor" of Magellan and, therefore, could not "wind up" Magellan's business. Two years later, in June 2011, the Texas trial court purported to vacate the order abating the case.

In November 2011, New Hampshire, for the first time, moved to compel arbitration of Magellan's then-pleaded declaratory judgment claims. New Hampshire argued that arbitration was necessary because Magellan had repeatedly admitted as much in earlier proceedings. Detailing New Hampshire's history of contesting arbitration, Magellan responded that judicial estoppel, judicial admission, collateral estoppel, and waiver barred New Hampshire from compelling arbitration of Magellan's claims. In December 2011, before the hearing on New Hampshire's motion, Magellan filed its second amended petition, removing its nine requests for declaratory relief and substituting claims against New Hampshire for breach of contract, fraud, breach of fiduciary duty, conversion, accounting, and theft under the Texas Theft Liability Act. The trial court ultimately denied New Hampshire's motion to compel arbitration. This interlocutory appeal followed.

### III. PRIOR DISMISSAL FOR WANT OF PROSECUTION

Neither party raises any jurisdictional arguments, but we feel compelled to first address a procedural matter that was partly the subject of a recent original proceeding in this court. On December 30, 2009, the Texas trial court dismissed for want of prosecution Magellan's lawsuit against New Hampshire. Almost fifteen months later, on March 17, 2011, the trial court vacated its December 30, 2009 dismissal order and reinstated the cause. New Hampshire later filed a petition for writ of mandamus, arguing that the trial court lacked plenary power to reinstate the cause. *See In re New Hampshire Ins. Co.*, No. 02-12-00281-CV, 2012 WL 3264392, at *1 (Tex. App.—Fort Worth Aug. 13, 2012, orig. proceeding [mand. denied]) (mem. op.). This court agreed with New Hampshire (notwithstanding that the cause had been abated when the trial court dismissed it) and conditionally granted the petition. *Id.* at *1–2. Although our holding meant that the cause was not reinstated in March 2011, Magellan later invoked the Texas trial court's subject-matter jurisdiction by filing the second amended petition in December 2011. *See Leach v. Brown*, 156 Tex. 66, 68–69, 292 S.W.2d 329, 330–31 (1956) (holding that the filing of an amended petition in the same cause in which a final judgment had already been entered was, like an original petition, sufficient to invoke the trial court's jurisdiction). We therefore

6

observe no jurisdictional impediment to our consideration of this interlocutory appeal.[1]

## IV. ARBITRABILITY OF MAGELLAN'S CLAIMS

In what we construe as a single issue, New Hampshire argues that the trial court erred by refusing to compel arbitration of the claims pleaded by Magellan in its second amended petition. Specifically, New Hampshire contends that the claims involve the interpretation of the Reinsurance Agreement, that it did not waive the right to arbitrate any of the claims, and that none of the other equitable principles cited by Magellan prevent enforcement of the arbitration provision because the pending claims are separate and distinct from the matters involved in the TCI and New York litigation.

Magellan responds that its fraud, breach of fiduciary duty, conversion, theft, and accounting claims are outside the scope of the arbitration clause because, on their face, they do not involve the interpretation of the Reinsurance Agreement. Further, although Magellan does not dispute that its breach of contract claim is within the scope of the arbitration agreement, it argues that its former requests for declaratory relief "essentially morphed" into the breach of

---

[1]This court has also previously issued a memorandum opinion addressing New Hampshire's arguments that Magellan failed to comply with the requirements for recognition of foreign country judgments under the Uniform Foreign Country Money-Judgment Recognition Act. *See New Hampshire Ins. Co. v. Magellan Reins. Co.*, No. 02-11-00334-CV, 2013 WL 105654, at *1 (Tex. App.—Fort Worth Jan. 10, 2013, no pet.) (mem. op.). Nothing in that opinion conflicts with our holding in this memorandum opinion.

7

contract claim and that New Hampshire's request to compel arbitration of the breach of contract claim is barred by judicial estoppel, judicial admission, collateral estoppel, and waiver because of New Hampshire's prior conduct contesting arbitration in the TCI litigation, the New York proceeding, and the pre-second amended petition Texas litigation. To the extent that the non-breach of contract claims are covered by the arbitration agreement, Magellan argues that they too are barred on the same grounds.

New Hampshire replies that its past arguments contesting arbitration are irrelevant and cannot preclude it from compelling arbitration at this point because the second amended petition alleges entirely new causes of action, the arbitrability of which New Hampshire has never argued against.

## A. Standard of Review

We review the trial court's denial of a motion to compel arbitration for an abuse of discretion. *See In re Labatt Food Svc., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding); *Cleveland Constr., Inc. v. Levco Constr., Inc.*, 359 S.W.3d 843, 851–52 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd) (explaining standards of review for arbitration appeals). Under this standard, we defer to the trial court's factual determinations that are supported by the record and review legal questions de novo. *Cleveland Constr., Inc.*, 359 S.W.3d at 851–52.

**B. Choice of Law**

The Reinsurance Agreement states that it "shall be governed by and construed in accordance with the laws of the State of New York." Although New Hampshire observes that the Reinsurance Agreement is governed by New York law and cites a number of New York cases in its briefing, it predominantly relies on Texas caselaw and has confirmed on several occasions that there is no relevant distinction between Texas and New York law. "As there appears to be no conflict of laws, 'there can be no harm in applying Texas law.'" *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 606 (Tex. 2005) (orig. proceeding) (quoting *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 672 (Tex. 2004)); *Aldridge v. Thrift Fin. Mktg., LLC*, 376 S.W.3d 877, 882 (Tex. App.—Fort Worth 2012, no pet.) (reasoning similarly). We therefore apply Texas law.

**C. Magellan's Non-Breach of Contract Claims**

A party attempting to compel arbitration must establish a valid arbitration agreement whose scope includes the claims asserted.[2] *In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006) (orig. proceeding). In determining whether a claim falls within the scope of an arbitration agreement, we focus on the factual allegations of the complaint, rather than the legal causes of action asserted. *See Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 271 (Tex. 1992). Any doubts about whether Magellan's non-breach of contract claims fall within

---

[2]Whether the Federal Arbitration Act (FAA), Texas Arbitration Act, or both apply is not at issue in this appeal, nor does it affect our analysis or jurisdiction.

the scope of the arbitration agreement must be resolved in favor of arbitration. *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995). The policy in favor of enforcing arbitration agreements is so compelling that a court should not deny arbitration unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation that would cover the dispute at issue. *Id.* If a party establishes a valid arbitration agreement whose scope includes the claims asserted, the burden shifts to the party opposing arbitration to prove its defenses to arbitration. *AdvancePCS Health, L.P.*, 172 S.W.3d at 607.

Here, there is no dispute that a valid arbitration agreement exists. As for whether Magellan's non-breach of contract claims are subject to arbitration, the fraud claim complains of "words, acts, [and] conducts [by New Hampshire] . . . which were false." The breach of fiduciary duty claim alleges that New Hampshire "acted in its own best interest and contrary to the interest of Magellan." The conversion claim alleges that in withdrawing trust funds, New Hampshire "converted property which belonged to Magellan." The theft claim alleges that New Hampshire "unlawfully appropriated or stole the funds contained in the trust account." And the accounting claim alleges that New Hampshire "should be required to render a full and complete detailed accounting of all claims and monies paid." Thus, to some extent, each of Magellan's claims implicates New Hampshire's duties and responsibilities under the Reinsurance Agreement. We therefore cannot conclude with positive assurance that Magellan's non-breach of contract claims do not require—or at a minimum, touch upon in some

10

way—the interpretation of the Reinsurance Agreement. *See, e.g.*, *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 754–56 (Tex. 2001) (compelling arbitration of tort claims related to financing contract); *Jack B. Anglin Co.*, 842 S.W.2d at 271 ("Although the City's misrepresentation claims are grounded in legal theory distinct from its contract claim, they are factually intertwined, and thus are subject to the arbitration provision of the contract."); *Hou-Scape, Inc. v. Lloyd*, 945 S.W.2d 202, 205–06 (Tex. App.—Houston [1st Dist.] 1997, orig. proceeding) (holding that tort claims were arbitrable because they arose out of and were related to contract). We hold that Magellan's fraud, breach of fiduciary duty, conversion, theft, and accounting claims are within the scope of the arbitration agreement.

### D.    Magellan's Defense to Arbitration:  Judicial Estoppel

Magellan argues that even if all of its claims are subject to arbitration, New Hampshire is judicially estopped from compelling arbitration of those claims. We agree.

The doctrine of judicial estoppel precludes a party who successfully maintains a position in one proceeding from afterwards adopting a clearly inconsistent position in another proceeding to obtain an unfair advantage. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 643 (Tex. 2009); *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008), *cert. denied*, 555 U.S. 1137 (2009). It is not intended to punish inadvertent omissions or inconsistencies but rather to prevent parties from playing fast and loose with

11

the judicial system for their own benefit. *Ferguson*, 295 S.W.3d at 643. As one court has observed, the doctrine's purpose is "to prohibit the deliberate shifting of position to suit exigencies of each particular case that may arise concerning the subject matter in controversy." *Moore v. Neff*, 629 S.W.2d 827, 829 (Tex. App.— Houston [14th Dist.] 1982, writ ref'd n.r.e.).

The record demonstrates that Magellan first raised the issue of arbitration at the outset of the TCI litigation, when it sought to stay those proceedings. New Hampshire argued against arbitration and described the dispute as regarding the "calculation of sums owing," which according to New Hampshire, did not involve the interpretation of the Reinsurance Agreement. The TCI lower court agreed with New Hampshire and denied Magellan's request to stay the proceedings for arbitration. Thus, in successfully defending against arbitration in the TCI litigation, New Hampshire convinced the TCI lower court that the scope of the proceedings there did not involve any interpretation of the Reinsurance Agreement.

Magellan raised the issue of arbitration again in the New York proceeding when it sought to enjoin the TCI proceedings. As in the TCI litigation, New Hampshire argued against arbitration, describing its petition in the TCI action as one that was "not based upon a dispute regarding the interpretation of the Reinsurance Agreement" and explaining that "Magellan's statutory insolvency under" TCI law did not involve the interpretation of the Reinsurance Agreement. The New York court declined to stray from the reasoning of the TCI lower court's

order denying arbitration and, like the TCI lower court, adopted New Hampshire's narrow interpretation of the proceedings, concluding that "[t]he question of whether petitioner owes money is not an interpretation of the" Reinsurance Agreement.

In September 2005, as the TCI litigation progressed, Magellan initiated the Texas action and sought nine declarations regarding the parties' rights "under the Reinsurance Agreement." Notwithstanding Magellan's unambiguous reference explaining its intent in seeking the declarations (to determine rights "under the Reinsurance Agreement"), even the most cursory review of the nine declarations reveals that each indisputably required an interpretation of the Reinsurance Agreement; they stated,

a. Whether [New Hampshire] validly withdrew funds from the trust and whether [New Hampshire] is obligated to refund amounts previously withdrawn in error from the trust and the amount of such refund, including interest;

b. Whether the Reinsurance Agreement allows a deduction for "timing differences";

c. Whether [New Hampshire] can withdraw amounts from the Trust without providing supporting detailed claims documentation that supports the amounts withdrawn;

d. Whether [New Hampshire] has sole discretion to summarily determine the amount of unearned premium reserves pursuant to Article IV of the Reinsurance Agreement;

e. the detail required in the cession statements under Article VII of the Reinsurance Agreement;

f. Magellan's right to audit [New Hampshire's] books and records under Article XI of the Reinsurance Agreement; and

13

whether, under Article XI of the Reinsurance Agreement, Magellan sufficiently disputed the amount [New Hampshire] claims is owing to the Trust;

g.  the identity of dealers and/or contracts covered by the Reinsurance Agreement;

h.  whether, under Article XI of the Reinsurance Agreement, Magellan's request to audit [New Hampshire's] books and records can be conditioned on Magellan depositing the amount requested by [New Hampshire] into the Trust, and vice versa; and

i.  the correct and valid amount of the reinsurance claims, if any, by [New Hampshire] against Magellan.

Although New Hampshire had successfully argued against arbitration by narrowly defining both the purpose and scope of the proceedings as involving *only* a determination of the amount of money owed by Magellan to New Hampshire, when it sought to dismiss or abate Magellan's Texas lawsuit, it argued that "[t]he issues Magellan now asks this Court to decide [which obviously involved an interpretation of the Reinsurance Agreement] *mirror those raised, litigated[,] and currently pending in the TCI . . . Action.*"  [Emphasis added.]  Indeed, New Hampshire successfully argued,

> The central issue in the TCI lawsuit is whether Magellan should be wound up for its failure to adequately fund a trust account pursuant to the terms of a reinsurance agreement between the parties. Though that precise issue is not presented to this Court in Magellan's request for declaratory judgment, *all issues presented are part and parcel of that determination* and all concern the amount of Magellan's debt to [New Hampshire], an issue that will be addressed by the liquidator appointed in the TCI Action. *Because all issues in this subsequently-filed action may be, or currently are, in litigation in the TCI lawsuit*, this Court should dismiss Magellan's request for declaratory judgment.  [Emphasis added.]

14

Thus, in seeking to dismiss or abate the Texas action, New Hampshire's interpretation of the scope of the TCI litigation shifted from its earlier narrow description of the proceedings as merely involving a determination of the amount of money owed by Magellan to broadly construing the proceedings to include all of Magellan's declarations seeking to interpret multiple parts of the Reinsurance Agreement. Notwithstanding this, and perhaps intending to quash any further attempts by Magellan to compel arbitration in light of New Hampshire's amended perception of the scope of the proceedings there, New Hampshire stated in a footnote in its motion to dismiss or abate that it "denies that there is a dispute 'arising out of interpretation of the Reinsurance Agreement,'" a statement that irreconcilably conflicted with its arguments broadly construing the scope of the TCI litigation. New Hampshire subsequently prevailed, just as it had in the TCI lower court and the New York litigation.

Several years later, after the TCI litigation had concluded, New Hampshire moved to compel arbitration of Magellan's claims, which at the time were those included in Magellan's first amended petition—the nine declarations. According to New Hampshire, "a valid arbitration agreement exists that is in writing, encompasses the subject matter of the dispute, involves transactions in interstate commerce, and therefore requires arbitration under the FAA." Although Magellan quickly filed its second amended petition, removing the declaration requests and

15

substituting them with its current claims, New Hampshire's intent was clear: it now wanted to arbitrate Magellan's claims.

The foregoing portions of the record thus show that, regarding the scope of the TCI and New York litigation as it pertained to the propriety of compelling arbitration, New Hampshire, to its benefit, maintained a position in the TCI lower court and the New York proceeding that was inconsistent with its position in the Texas action. Now, a number of years later, New Hampshire is attempting to accomplish a similar feat; it successfully argued against arbitration of Magellan's claims in the TCI litigation and the New York proceeding but now wants to compel arbitration. The unfair advantage that New Hampshire stands to gain simply consists of the fruits of shifting position to suit the exigencies of each particular cause. *See Ferguson*, 295 S.W.3d at 643; *Moore*, 629 S.W.2d at 829. This is the precise conduct that judicial estoppel is meant to prohibit.

New Hampshire argues on rehearing that judicial estoppel is inapplicable because the doctrine does not apply to contradictory positions taken in the same proceeding. *See Pleasant Glade Assembly of God*, 264 S.W.3d at 6, 8. It states that "[n]either the Court nor Magellan contends that [New Hampshire's] motion to compel arbitration is inconsistent with [New Hampshire's] position in the TCI and New York courts. The only alleged inconsistencies are the statements from [New Hampshire's] motion to dismiss or abate." New Hampshire misreads our analysis. We do not rely upon any inconsistency between the motion to dismiss or abate and the motion to compel arbitration in the Texas action to support our

16

conclusion that New Hampshire is judicially estopped from compelling arbitration. Our conclusion applying judicial estoppel rests upon the inconsistencies between New Hampshire's motion to compel arbitration in the Texas proceeding and its arguments and contentions in the TCI and New York proceedings contesting arbitration. *Pleasant Glade Assembly of God* is therefore inapposite.

New Hampshire argues that its prior conduct contesting arbitration is irrelevant because it has never argued that the claims alleged by Magellan in its second amended petition are not arbitrable. According to New Hampshire, "Magellan identifies no case law or other authority . . . holding that an alleged waiver or estoppel of a party's right to arbitration applies to a later-amended complaint alleging entirely new causes of action." This is a compelling argument, but it is ultimately unpersuasive because it relies upon a hypertechnical perspective of the proceedings that is inconsistent with the reality of what this dispute has always been, and continues to be, about—both parties' rights and duties and compliance or noncompliance with one or more terms of the Reinsurance Agreement.

When Magellan filed its original petition in the Texas action, it attached correspondence between it and New Hampshire dating as far back as 2002. Even at this early stage of the dispute, it was apparent that the disagreements between the parties involved their respective rights and duties under the Reinsurance Agreement—New Hampshire defended its claims handling and accounting and demanded that Magellan deposit funds into the trust account,

17

and Magellan challenged New Hampshire's claims amounts, demanded to inspect New Hampshire's books and records, and refused to deposit additional funds into the trust account. The correspondence abounds with references to the Reinsurance Agreement.

In the TCI litigation, New Hampshire convinced the TCI lower court that arbitration was unnecessary because the dispute involved only the calculation of money owed by Magellan, an exclusively non-interpretive, factual matter. But the record belies this overly narrow characterization; the dispute involved much more than a simple debt, and Magellan tried to explain this in the TCI litigation. Philip Apgar's affidavit, which Magellan appears to have filed as part of its first appeal of the lower court's order requiring Magellan's business to be wound up, illuminated the extent of the dispute between the parties, stating,

> It is apparent that there are significant differences between the parties. They are in effect of at least two types.
>
> (1)    First there are issues regarding the principles on which [New Hampshire] has produced its Cession Statements and the appropriate sums that ought to be included within them. These include questions regarding the extent of [New Hampshire's] discretion to charge its costs against premiums and to determine the level of unearned premium reserve.
>
> (2)    Secondly, there is the question of whether under the Reinsurance Agreement the parties intended that Magellan, when faced with a payment demand which could only be validated by an audit of the Petitioner's records under Art XI, would in effect be barred from challenging that demand unless it had exercised its audit right within two calendar quarters of service of the demand by the Petitioner.
>
>     . . . .

18

I am advised that [the] winding up procedure ought not to be used for claims other than genuinely undisputed debts and claims where, though there is a dispute, the dispute can be shown easily and quickly to be not genuine in the sense of being groundless. I would submit that it is apparent from what I say above that here there is a real dispute which is still unresolved after months of detailed argument by myself and, on [New Hampshire's] behalf, Ms. Cheshire.

It is moreover a dispute of a type which the parties have agreed should be dealt with by arbitration and which is particularly suitable for arbitration.

And particularly telling is the judgment of the Lords of the Judicial Committee of the Privy Council. Even though the limited issue before the high court concerned New Hampshire's status as a "creditor," the judgment includes approximately five single-spaced pages of excerpts from the Reinsurance Agreement. Given that New Hampshire's and Magellan's relationship is governed by the Reinsurance Agreement, it is no surprise that the high court chose to begin its analysis by extensively referencing the Reinsurance Agreement's terms.

In the New York proceeding, New Hampshire persisted in its characterization of the dispute as one not involving the interpretation of the Reinsurance Agreement, but in doing so, it simultaneously observed that the dispute involved Magellan's failure to deposit funds into a trust account "*as required by the Reinsurance Agreement.*" [Emphasis added.] Thus, even when narrowly characterizing the scope of the dispute before the New York court, New

Hampshire could not escape the significance of the Reinsurance Agreement as it pertained to New Hampshire's relationship and dispute with Magellan.

And finally, although Magellan has amended its petition several times, its claims in the Texas litigation—whatever label they have been given—have consistently implicated an interpretation of the terms of the Reinsurance Agreement. *Cf. Jack B. Anglin Co.*, 842 S.W.2d at 271 (reasoning that we focus on the factual allegations of the complaint, rather than the legal causes of action asserted, when determining whether claim falls within the scope of an arbitration agreement).

A thorough review of the record thus reveals this: Neither New Hampshire's varying characterizations of the proceedings nor the labels attached to the claims alleged by Magellan in its petitions define the essence of the dispute between New Hampshire and Magellan. The dispute has always centered around, and continues to entail, each party's rights and duties and compliance or noncompliance under the Reinsurance Agreement. On more than one occasion, in one form or another, New Hampshire has argued against the arbitrability of this dispute. Its conduct has been overwhelmingly inconsistent with its present attempt to compel arbitration.

New Hampshire argues on rehearing that we should not rely upon its conduct in the TCI litigation to support a determination of judicial estoppel because to do so requires, erroneously, a broad construction of the arbitration provision. But reliance on New Hampshire's conduct in the TCI litigation does

20

not require us to broadly construe the arbitration provision—or to even construe it at all. As our analysis demonstrates, we merely review numerous documents evidencing years of litigation—a unique perspective unavailable to the other courts—to conclude that the claims asserted by Magellan in its second amended petition involve facts and issues that are no different than the issues contested by the parties in the other forums.

Accordingly, in light of all the foregoing, we cannot agree with New Hampshire's overriding argument that it has never challenged the arbitrability of the claims alleged by Magellan in its second amended petition.

We hold that New Hampshire is judicially estopped from compelling arbitration and, therefore, that the trial court did not abuse its discretion by denying New Hampshire's motion to compel arbitration. We overrule New Hampshire's sole issue.

## V. CONCLUSION

Having overruled New Hampshire's only issue, we affirm the trial court's order denying New Hampshire's motion to compel arbitration.

BILL MEIER
JUSTICE

PANEL: GARDNER, MCCOY, and MEIER, JJ.

DELIVERED: May 2, 2013