

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00033-CV

PAUL FLORES                                                      APPELLANT

V.

DEUTSCHE BANK NATIONAL                                          APPELLEES
TRUST COMPANY, AS TRUSTEE
FOR FREMONT HOME LOAN;
WELLS FARGO HOME
MORTGAGE, INC. D/B/A
AMERICA'S SERVICING
COMPANY; AND BRICE, VANDER
LINDEN & WERNICK, P.C.

----------

### FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 17-243110-10

----------

## MEMORANDUM OPINION[1]

----------

---

[1]*See* Tex. R. App. P. 47.4.

The lawsuit in this case centers on the nonjudicial foreclosure of a deed of trust covering the home of Appellant Paul Flores. The beneficiary of the deed of trust is Deutsche Bank National Trust Company, as trustee for Fremont Home Loan. The loan secured by the deed of trust was serviced by Appellee Wells Fargo Home Mortgage, Inc., (Wells Fargo) d/b/a America's Servicing Company (ASC). Appellee Brice, Vander Linden & Wernick, P.C. (BVW), a law firm, was hired by Wells Fargo to handle the foreclosure proceedings. After a nonjudicial foreclosure of a deed of trust on his home, the setting aside of that foreclosure, and a subsequent notice of a second foreclosure sale, Flores sued Deutsche Bank, Wells Fargo, (collectively the Banks) and BVW. He asserted, among other claims, that the lien on his home was invalid under the Texas Constitution, that the foreclosure breached a forbearance agreement, and that the parties violated common law and statutory restrictions on debt collection. The trial court granted summary judgment for Appellees.

Flores brings four issues on appeal. Because we hold that the trial court did not err by granting summary judgment on the ground that Flores did not have standing to assert a constitutional claim for lien invalidity, that the doctrines of judicial estoppel and judicial admissions preclude Flores's claims for debt collection practices to the extent they are based on allegations of the lien's invalidity, that the Banks did not have an agreement with Flores to not foreclose while considering a modification of his loan agreement, and that the evidence does not raise a fact issue on his fraud and debt collection claims, we affirm.

## Background

In January 2006, Flores and his then wife applied for a residential loan. On the application, Flores indicated that the purpose of the loan was to refinance an existing mortgage on the property and that the purpose of the refinance was a "cash-out debt consolidation." On the loan application, a box was checked indicating that the property would be a primary residence. But the loan application also included a rider signed by Flores that certified "[n]o applicant or owner now occupies the subject property or intends to occupy the subject property within 60 days of the close of escrow or settlement." In connection with the loan, the property was appraised. The appraisal included a projection for estimated income from renting the property.

The loan was made through Fremont Investment & Loan. The loan paid off two existing loans, one to Flagstar Bank in the amount of $129,212 and one to Greentree Servicing LLC in the amount of $25,452.62. Flores also took out a second new loan of $10,100. The total principal loaned under the first note was $181,800.00. Flores took $20,199.28 out in cash from that loan, plus the $10,100 from the second loan.

Each of the notes on the two loans was secured by a deed of trust. The deed of trust securing the first note—the deed of trust under which the foreclosure sale was later conducted—stated that the loan was not a home equity loan. The deed of trust securing the second note used a different form, one for a second mortgage and refinance, and did not contain a section

3

indicating the purpose of the loan. It did, however, include a rider under which Flores and his then-wife agreed to assign to the lender all rents from the property upon default.

In May 2008, Flores filed for Chapter 7 bankruptcy. In August 2008, Flores received a discharge. Approximately one week later, the bankruptcy judge signed an agreed order terminating the automatic stay as to ASC. Flores made a payment to ASC in October and November of that year, but he did not make the December 2008 payment. He also did not make his payments for January 2009 through April 2009.

In April 2009, Flores, through a company called Mortgage Solutions, applied for a loan modification with Wells Fargo. On April 22, 2009, ASC sent Flores a letter containing the terms of an offer for a forbearance agreement. The letter stated that "in consideration of extending forbearance for a period of time, it is necessary that you indicate your understanding and acceptance of the terms of the forbearance agreement by immediately signing and returning this agreement." Flores did not sign and return the document. The letter also required Flores to make five payments, with the first payment due on April 29, 2009.

On May 13, 2009, an attorney with BVW sent Flores a demand to vacate the premises. The letter stated that Deutsche Bank, as Trustee for Fremont Home Loan Trust 2006-1, had purchased the property at a nonjudicial foreclosure sale that had been held on May 5, 2009.

4

Flores notified Wells Fargo that he had made the first payment required under the offer of forbearance, and it was discovered that Flores had put the wrong loan number on his payment. The foreclosure sale was set aside. But in August 2009, BVW sent Flores a notice that the property was set for a nonjudicial foreclosure sale on September 1, 2009. This sale did not take place, however.

In January 2010, Flores filed suit against the Banks and BVW. He asserted claims for fraud and breach of contract. He also made statutory and common law debt collection claims and sought a declaratory judgment that the deeds of trust on the first and second notes were void because the loans did not comply with the requirements of the Texas Constitution for loans on homesteads.

The Banks filed a motion for traditional and no-evidence summary judgment. The trial court granted the motion without specifying the grounds on which the motion was based. Thereafter, Flores amended his petition. The Banks filed a second motion for summary judgment, and BVW also filed a motion for summary judgment. The trial court granted the motions without specifying the ground on which judgment was granted. Flores now appeals.

## Standard of Review

We review a summary judgment de novo.[2] We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence

---

[2] *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

contrary to the nonmovant unless reasonable jurors could not.[3]   We indulge every reasonable inference and resolve any doubts in the nonmovant's favor.[4]   A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.[5]

**Analysis**

1. *Flores's third issue:  standing to assert his constitutional claim*

Flores raises four issues in his appeal.  We start with Flores's third issue because it involves the question of standing.  In this issue, Flores asks whether a home equity loan that purports "to allow for, among other things, non-judicial foreclosures and to hold the homeowner personally liable, [are] invalid under the Texas Constitution."  He challenges the summary judgment as to his claim for declaratory relief regarding the validity of the notes and deeds of trust.

In their first summary judgment motion, the Banks asserted that Flores had no standing to assert his constitutional claim because any such claim became property of the bankruptcy estate when Flores filed for bankruptcy, and, therefore, the bankruptcy trustee had exclusive standing to assert any such claim.  BVW also argued in its motion that Flores lacked standing to assert the

---

[3]*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

[4]*20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

[5]*Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

invalidity of the liens because that claim was transferred to the bankruptcy estate upon Flores's bankruptcy filing.

Flores argues in his brief that "the rights asserted by [him] were not a part of the bankruptcy estate because they were claimed as exempt under 11 U.S.C. § 522 and listed on the Schedule C filed." He asserts that the exemptions were approved with no objection by the Banks, and "the bankruptcy trustee would have no interest in Flores's homestead or claims related to such ownership."

We are unclear what rights Flores claims to have listed as exempt on his bankruptcy schedule. He listed the Banks' security interest in the property, but he described the first lien as a purchase money lien and the second as a "2nd lien." Neither lien was characterized as arising from a home equity loan. He did not list a claim based on the notes or deeds of trust, such as the claim he makes here that the liens violated the Texas Constitution.

Nothing in Flores's representations to the bankruptcy court would have notified the trustee that Flores believed either loan to be a home equity loan. Nothing would have notified the trustee that Flores had a potential claim based on the loans because he neither disclosed the claim nor described the loans in a way that would have given notice of the claim. We therefore cannot conclude on this record, as Flores does, that the trustee would have no interest in the property. We cannot know what position the trustee would have taken with respect to this property because Flores did not disclose the claim for the trustee to choose whether to abandon it.

7

But for purposes of determining standing, we do not need to guess what action the trustee would have taken. Because Flores did not list the claim, it was not administered, and it therefore remains property of the estate.[6]

Flores expands on his argument in his reply brief. He first argues that he "continuously lived in the . . . Property from 2003 to the present and absent an objection to his claim that it was exempt, it was deemed allowed and returned to him when the discharge was granted and the case was closed." Flores does not specify what property he is arguing is exempt—the residence or his claim that the liens on the property were invalid. Either way, he is incorrect. The claim that the liens violated the constitution and were therefore invalid was not exempt because he did not include it on his list of assets and did not claim it as exempt.[7] The property itself was not exempt because he took the federal exemptions, and under the federal exemptions, the debtor may exempt a certain amount of the property's value but not the property itself.[8]

---

[6] *See* 11 U.S.C.A. § 554 (West 2004 & Supp. 2014) (stipulating that property that is not scheduled and is neither abandoned by the bankruptcy trustee nor administered in the case remains property of the estate).

[7] *See id.* § 522(*l*) (West 2004) (stating the property claimed as exempt by the debtor on a list of property filed in the bankruptcy case is exempt unless objected to by a party in interest).

[8] *See id.* § 522(b)(2), (d)(1) (West Supp. 2014) (exempting "[t]he debtor's aggregate interest, not to exceed $22,975 in value, in real property or personal property that the debtor or a dependent of the debtor uses as a residence").

Flores also argues in his reply brief that his request for declaratory relief only related to his exempt property, which is not property of the bankruptcy estate because the case was closed without an order denying his exemptions. And he asserts that because he did not have knowledge of the issue with the lien at the time of his bankruptcy, Appellees' argument that he lost standing to bring his declaratory judgment action because he did not list the claim in his bankruptcy schedules is without merit.

But again, because Flores took the federal exemptions, he could have exempted a certain amount of the property's value, but the property itself was not exempt. He took no exemption for any value of the property, and, therefore, no amount of the home's value was exempt from the bankruptcy estate. And because he did not list the claim that the liens were invalid, it was not exempt either.[9]

Furthermore, whether Flores had knowledge of his claim is irrelevant to whether the claim became a part of the bankruptcy estate.[10] And as to Flores's argument in his reply brief that he had no motive to conceal the claim, this

---

[9] *See id.*

[10] *See id.* § 541 (West 2004 & Supp. 2014) (providing that with limited exceptions, upon the commencement of a bankruptcy case, "all legal or equitable interests of the debtor in property as of the commencement of the case" becomes property of the bankruptcy estate).

9

argument is not relevant to whether the claim became a part of the bankruptcy estate.

Flores has not cited this court any case law that would support his assertion that his claim challenging the validity of the liens under the Texas Constitution did not become part of the bankruptcy estate. He has not cited any case law that would support an argument that the claim reverted to him when he received his discharge given that he did not disclose it and that it was therefore not administered. Accordingly, we hold that this claim is property of the bankruptcy estate, and Flores does not have standing to assert it. Because Flores does not have standing to bring a claim for a declaration that the liens are invalid under the Texas Constitution, we overrule Flores's third issue.

2. *Flores's fourth issue: Appellees' affirmative defenses*

In Flores's fourth issue, he asked whether an order lifting the bankruptcy stay sufficiently constitutes a prior ruling for purposes of invoking res judicata and collateral estoppel against subsequent claims that challenge the validity of liens. Flores's argument under this issue is broader than the framing of this issue, however. He also challenges the affirmative defense of judicial estoppel raised by BVW and the Banks in their summary judgment motions, as well as BVW's assertion that Flores's claim of lien invalidity was an impermissible collateral attack on the bankruptcy court's agreed order terminating the automatic stay.

2.1. Judicial estoppel

BVW asserted judicial estoppel as a ground for judgment on Flores's claims that were based on the foreclosure of what Flores alleged was an invalid lien. By adoption of BVW's motion, the Banks also asserted this ground in their motion that addressed the claims Flores added after the trial court had granted the Banks' first summary judgment motion. BVW argued that, having successfully taken the position in bankruptcy that the property was secured by a valid lien, Flores cannot now take the position that the lien was invalid from its inception.

"Judicial estoppel precludes a party who successfully maintains a position in one proceeding from afterwards adopting a clearly inconsistent position in another proceeding to obtain an unfair advantage."[11] The purpose of the doctrine is not "to punish inadvertent omissions or inconsistencies"; rather, it is "to prevent parties from playing fast and loose with the judicial system for their own benefit."[12]

This court applies federal law when deciding whether judicial estoppel applies based on a position that a party took in prior bankruptcy proceedings.[13]

---

[11] *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 643 (Tex. 2009).

[12] *Id.*

[13] *Stewart v. Hardie*, 978 S.W.2d 203, 208 n.1 (Tex. App.—Fort Worth 1998, pet. denied).

11

Under federal law, judicial estoppel applies when three elements are shown: (1) the party's later position is clearly inconsistent with its earlier position; (2) in the prior case, the party succeeded in persuading the court to accept that party's position, "so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'"; and (3) the party asserting the inconsistent position "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."[14] When considering a debtor's disclosures in bankruptcy for purposes of judicial estoppel, the Fifth Circuit has noted that "[v]iewed against the backdrop of the bankruptcy system and the ends it seeks to achieve, the importance of this disclosure duty cannot be overemphasized"; "'the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets.'"[15]

The Fifth Circuit and Texas courts have recognized an additional factor: that "the party to be estopped has acted intentionally, not inadvertently."[16] A

---

[14]*New Hampshire v. Maine*, 532 U.S. 742, 750–51, 121 S. Ct. 1808, 1815 (2001); *but see In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) ("Because the doctrine is intended to protect the judicial system, rather than the litigants, detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary.").

[15]*In re Coastal Plains*, 179 F.3d at 208 (citation omitted).

[16]*Id.* at 206; *Norris v. Brookshire Grocery Co.*, 362 S.W.3d 226, 230 (Tex. App.—Dallas 2012, pet. denied); *see also Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1302 (Fed. Cir. 2002) ("Whether judicial estoppel applies is a matter of regional [federal] circuit law.").

court may find a debtor's inconsistent previous disclosure in bankruptcy is inadvertent only when the debtor either lacked knowledge of the facts giving rise to the inconsistent position or had no motive for taking the inconsistent position.[17]

The Fifth Circuit recently clarified that it applies the inadvertence element "only when the judicial estoppel is based on the non-disclosure of a claim in a prior bankruptcy proceeding."[18] It explained that "this requirement does not logically apply outside of the bankruptcy code's disclosure procedures—the requirement necessarily presumes that a 'non-disclosure' has occurred, and it is concerned with the party's intent behind the non-disclosure."[19]

In this case, BVW relied on evidence of disclosure and nondisclosure—evidence it contended showed that not only did Flores not disclose the claim for lien invalidity that he now asserts, but he made affirmative representations about the validity and character of the liens. This court has not addressed whether the inadvertence element under federal judicial estoppel law applies equally to an

---

[17] *Garcia v. BNSF Ry. Co.*, 387 S.W.3d 763, 768 (Tex. App.—El Paso 2012, no pet.) (citing *In re Coastal Plains*, 179 F.3d at 210, and applying this standard to a debtor's nondisclosure in bankruptcy of a potential claim); *Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 601 n.4 (5th Cir. 2005) ("[T]he controlling inquiry, with respect to inadvertence, is the knowing of facts giving rise to inconsistent positions.").

[18] *Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 553 n.3 (5th Cir. 2014) (emphasis added) (declining to apply that element outside of the context of a bankruptcy case).

[19] *Id.*

affirmative disclosure in bankruptcy as it does to nondisclosure.  The Texas Supreme Court has not directly addressed the issue, either, although in a case in which it declined to apply judicial estoppel based on the nondisclosure of a claim in bankruptcy, it noted generally that the doctrine of judicial estoppel "is not intended to punish inadvertent . . . inconsistencies,"[20] language that appears to encompass more than nondisclosures.

Here, BVW submitted summary judgment evidence showing that in Flores's bankruptcy case, he included the lien on Schedule D, the list of creditors holding secured claims.  The schedule form asks for the "nature of [the] lien," and on that form Flores characterized the lien as a "Purchase Money" lien.  Whether this representation was intended to indicate that the lien arose from the loan that provided the funds to purchase the property in the first place or that it arose from the loan that refinanced the original purchase money loan is not clear.  But Flores clearly did not characterize this lien as arising from a home equity loan, and Flores declared the schedule to be correct under penalty of perjury.

In another document signed by Flores and filed in the bankruptcy court, Flores indicated his intention to reaffirm the lien.  Although no reaffirmation agreement between Flores and the Banks was included in the record,[21] the

---

[20] *Ferguson*, 295 S.W.3d at 643.

[21] *See* 11 U.S.C.A. § 524(c), (d), (m) (West 2004 & Supp. 2014) (discussing requirements of reaffirmation agreements); Fed. R. Bankr. P. 4008.

14

trustee apparently accepted Flores's contention that the property was secured with a valid lien because the trustee concluded that the estate had no assets to administer. And Flores, in his response to BVW's summary judgment motion, asserted that he had reaffirmed the lien in the bankruptcy.

BVW thus produced evidence supporting the first element—that Flores took a position in his bankruptcy case that is clearly inconsistent with his current position. Flores represented that the Banks had a valid security interest in the property, and he represented that the nature of that interest was a purchase money lien. In this proceeding, Flores asserts that the nature of the loan was a home equity loan, the nature of the Banks' interest was *not* a purchase money lien, and the Banks do *not* have a valid security interest in the property. And he did not disclose in bankruptcy that he had a claim that the lien was invalid on constitutional grounds.

As for the second element, the bankruptcy court accepted his previous position. When a debtor receives a discharge based on information he gave about his bankruptcy estate, the bankruptcy court is considered to have accepted the debtor's position for purposes of judicial estoppel.[22] Here, the evidence shows that Flores received a discharge. After the bankruptcy court accepted Flores's position regarding the nature of the loan and the Banks' interest in the property and Flores received a discharge, Flores took an inconsistent position in

---

[22]*See Norris*, 362 S.W.3d at 230.

15

this proceeding. And regarding the third element, Flores's successfully maintaining his new position would give him an unfair advantage.[23]

Assuming that we must also consider whether Flores acted inadvertently not just when he failed to list his claim but also when he affirmatively represented that the Banks had a valid security interest in his property,[24] we now look at what the record shows on that element.

Applying the law we noted above, the trial court could have concluded that Flores's inconsistent position in bankruptcy was inadvertent only if he either lacked knowledge of the facts giving rise to the inconsistent position or had no motive for taking the inconsistent position.[25] As to the motive sub-element, the Fifth Circuit has held that it is "almost always met if a debtor fails to disclose a claim or possible claim to the bankruptcy court"; "[m]otivation in this context is self-evident because of potential financial benefit resulting from the

---

[23]*See New Hampshire Ins. Co. v. Magellan Reinsurance Co.*, No. 02-12-00196-CV, 2013 WL 1830349, at *7 (Tex. App.—Fort Worth May 2, 2013, no pet.) ("The unfair advantage that New Hampshire stands to gain simply consists of the fruits of shifting position to suit the exigencies of each particular cause.").

[24]*See Gabarick*, 753 F.3d, at 553 n.3.

[25]*Garcia*, 387 S.W.3d at 768 (citing *In re Coastal Plains*, 179 F.3d at 210, and applying this standard to a debtor's nondisclosure in bankruptcy of a potential claim); *Jethroe*, 412 F.3d at 601 n.4 ("[T]he controlling inquiry, with respect to inadvertence, is the knowing of facts giving rise to inconsistent positions.").

nondisclosure."[26]  Flores did not disclose his constitutional claim regarding the lien's validity, and the potential financial benefit resulting from nondisclosure gave Flores a motive to not disclose it.

As to Flores's motive in affirmatively representing that the Banks had a valid purchase money security interest in the property, the record shows he had a motive to conceal that the loan was a home equity loan with a voidable lien, if in fact that was what kind of loan Flores applied for and should have received.  In the bankruptcy proceedings, Flores had to choose between claiming the federal exemptions or the Texas exemptions.  Each option has advantages and disadvantages.  For example, Flores listed on the schedule of exempt property an amount described as "Phil Kaminsky—amount owed for mold remediation services in FL," and he listed the value of that property as $35,000.  Using the Texas exemptions, a person may exempt unpaid commissions for personal services, but the section provides a cap on how much of that category may be exempted.[27]  That cap is twenty-five percent of $60,000, or $15,000.[28]  By

---

[26]*Love v. Tyson Foods, Inc.*, 677 F.3d 258, 262 (5th Cir. 2012) (citation omitted).

[27]Tex. Prop. Code Ann. § 42.001(d) (West Supp. 2014).

[28]*Id.* § 42.001(a), (d).

17

choosing the federal exemptions, Flores and his wife could choose to exempt more of the claim—and they did so, exempting $19,639.[29]

But by taking the federal exemptions, Flores gave up the exemption available under Texas law for a person's homestead.[30] Under the federal exemptions, if the debtor has property on which there is no lien and for which no exemption is taken, the property is sold and the proceeds distributed to unsecured creditors.[31] Consequently, because only a certain amount of a person's interest in real property is exempt under the federal exemptions, if there were no lien on Flores's home, it could have been sold to pay unsecured creditors. By representing that the property was burdened by a purchase money lien, Flores was able to save his home from a forced sale to pay the unsecured creditors. And Flores would have been in an even better position if he could have first protected the property from unsecured creditors by claiming that the

---

[29] *See* 11 U.S.C.A. § 522(b)(2) (stating that a debtor may choose the exemptions provided in that section), (d)(5) (allowing the debtor to exempt his interest in "any property" up to a certain amount), (m) (providing that each debtor may claim their own exemptions) (West 2004 & Supp. 2014). *See also In re Bippert*, 311 B.R. 456, 464 (Bankr. W.D. Tex. 2004) (discussing how community property is characterized in a bankruptcy case filed jointly by married debtors).

[30] *See* Tex. Prop. Code Ann. § 41.001 (West Supp. 2014); 11 U.S.C.A. § 522(b)(1) (West Supp. 2014) (providing that a debtor may not take both the federal and state exemptions).

[31] *See* 11 U.S.C.A. §§ 704, 726 (West 2004 & Supp. 2014) (providing that the trustee shall reduce property of the estate to money and then distribute the proceeds to the debtor's unsecured creditors).

property had a valid lien on it and then, after obtaining a discharge from bankruptcy, had the lien declared invalid against the secured creditors. Thus, if the loan were in fact a home equity loan with an invalid lien, Flores had a motive to conceal his knowledge of that fact.

As for the knowledge element, BVW produced evidence of that as well. The bankruptcy schedules show that Flores affirmatively represented that his loan was a purchase money loan. That representation is evidence of his awareness that his loan was not a home equity loan or, at the least, of his willingness to represent to the court that it was not a home equity loan.

As for his failure to disclose his claim, Flores's own affidavit stated that he decided to refinance his home loan, contacted a mortgage company to apply for the loan, and provided the information needed for the loan to the company's employee. This is evidence that Flores knew what kind of loan he thought he had applied for, was approved for, and believed he had received. That is, he knew whether he sought a loan to pay off a previous home equity loan, to obtain a new home equity loan, to refinance a loan he had obtained to purchase the property, or some combination thereof.[32] Yet he represented to the bankruptcy court that it was a purchase money lien, not a home equity lien. Even Flores's

---

[32] *See, e.g.*, *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 620 (Tex. 2007) (discussing the legal remedies available to a lender who provides a loan that contains both a portion that refinances a purchase money lien and a home equity portion).

affidavit does not state that he sought to obtain a loan secured with the equity in his home and that he believed he had received such a loan. And Flores does not explain why he was unable to discover before his bankruptcy what kind of loan he had received.

BVW made a prima facie showing that Flores took the position in the bankruptcy court that the lien was a purchase money lien, not a lien from a home equity loan, and that the lien was valid. Accordingly, the trial court did not err by granting summary judgment on this ground unless Flores produced sufficient summary judgment evidence to raise a fact issue.

In his brief, Flores points out evidence that he contends raised a fact issue on judicial estoppel. First, he points to his own affidavit as evidence that he had no knowledge of the constitutional deficiencies with the loan. He also states that the note and deed of trust speak for themselves as to the constitutional deficiencies with the loan. He argues that he had no reason to challenge the validity of the lien until May 2009 when an attorney pointed out the deficiencies in the loan documents to him.

Flores also states that it would have been favorable to him to list the debt as unsecured instead of secured. He argues that a determination that the lien was invalid in the bankruptcy case would have left him owning his homestead free and clear and the debt to the Banks uncollectible and that the trustee could not have sold the property because it was not property of the bankruptcy estate as it was claimed as exempt property. But because Flores took the federal

20

exemptions, the property was not exempt from sale to satisfy creditors. Thus, if the loan were not secured, then nothing would have prevented the property from being sold.[33]

Flores claims that under Texas law a homestead cannot be foreclosed upon to satisfy unsecured debt, and he therefore could have simply elected the state exemption for homesteads to avoid foreclosure on the home to satisfy an unsecured debt. But Flores did not claim the Texas homestead exemptions, and by opting for the exemptions he chose and claiming that there was a lien on the property, he was able to save his home from a forced sale to satisfy his unsecured creditors and to also claim as exempt a higher amount of the claim for personal services.

Two different categories of knowledge are involved in the parties' arguments about the relevance of the bankruptcy schedules. One category centers on the fact of the loan itself and its character—what kind of loan Flores sought, what kind of loan Flores received, and how Flores described that loan in bankruptcy. The other category relates to any claim that Flores would have against the Banks if the loan documents violated state law and to whether Flores knew of that violation. Flores argues that (1) he did not know at the time of his bankruptcy that he had a claim against the Banks based on the loan documents because he did not realize that the documents failed to comply with the law, (2)

---

[33]*See* 11 U.S.C.A. §§ 724, 726 (West 2004 & Supp. 2014).

that lack of knowledge is why he did not list the claims he is now asserting on his bankruptcy schedule, and (3) he therefore was not judicially estopped from asserting a claim that the documents violated the law. Flores, in other words, focuses on the second category—whether he knew that the documents allegedly did not contain disclosures required by law and whether he knew that the lack of those disclosures gave rise to a claim he should have listed in his bankruptcy schedules.

But Flores does not address the first category: the *facts* of the loan documents and what kind of loan he had or thought he had. Flores knew of the facts giving rise to the disclosures he made in bankruptcy schedules.[34] He may not have read the loan documents or realized their significance, but he produced no evidence to show that he was not aware of what kind of loan he had applied for and what kind of loan he believed he had received. When characterizing the type of loan he had with the Banks, he affirmatively described it as a "purchase money lien." That representation is evidence of what kind of loan Flores believed he had. More importantly, that representation is one he relied on in the bankruptcy court.

---

[34] *See, e.g.*, *In re Watts*, No. 09-35864, 2012 WL 3400820, at *7 (Bankr. S.D. Tex. Aug. 9, 2012) (applying judicial estoppel to the plaintiffs' claim after they failed to disclose the claim in bankruptcy when they "knew of the facts giving rise to their inconsistent position, [that is, they] knew of the facts forming the basis of the Claim").

Regardless of what constitutionally-required disclosures the loan documents did or did not contain, Flored has previously taken the position that the loan was not a home equity loan. Even if he did not realize that the loan documents did not contain disclosures that are required for home equity loans, and even if he did not realize that his loan documents stated that the loan was not a home equity loan, he knew whether he applied for a home equity loan, a purchase money loan, or a purchase money refinance loan. In his bankruptcy schedule, he not only acknowledged that the property was encumbered with a lien, but he characterized that lien as a purchase money lien, and he expressed his intention to reaffirm it. That plainly contradicts his position in this case that the loan was a home equity loan.

The issue is not whether Flores understood the legal significance of the fact that his loan documents did not contain certain disclosures. The issue is whether Flores knew the facts of what kind of loan he applied for and believed he had received, which would form the basis of his knowledge of what type of lien the loan documents created, and whether, if the loan was a home equity loan, Flores had a motive to characterize the lien as creating a valid security interest and to not disclose his potential claim of lien invalidity.[35] The trial court did not

---

[35] *See Siller v. LPP Mortg., Ltd.*, No. 04-11-00496-CV, 2013 WL 1484506, at *7 (Tex. App.—San Antonio Apr. 10, 2013, pet. denied) (mem. op.) (noting that the Sillers' bankruptcy petition and schedules expressly stated that the partnership owned certain property and was indebted to the bank and stating that

23

err by determining that Flores's failure to disclose the claim and his representation that the lien was a valid security interest were not inadvertent.

This evidence is not enough to raise a fact issue on judicial estoppel, and, consequently, the trial court did not err by granting summary judgment for BVW on the ground of judicial estoppel on Flores's claims that are based on the lien's invalidity. It also did not err by granting the Banks' second summary judgment motion on the ground of judicial estoppel. We overrule this part of Flores's fourth issue.

### 2.2. Judicial admissions

The Banks' first summary judgment motion did not include judicial estoppel as a summary judgment ground. They did, however, assert judicial admissions as a basis for summary judgment. They argued that Flores's claims were barred by his judicial admission in the bankruptcy proceedings acknowledging the existence of his secured indebtedness to the Banks and by the bankruptcy court's order lifting the automatic stay, which the Banks argued evidenced a stipulation of the parties as to Flores's default on the debt and propriety of the Banks' foreclosure. As the Banks pointed out in the motion, to qualify as a judicial admission, the admission must meet five requirements: (1) the statement was made during the course of a judicial proceeding; (2) the statement is

---

"[g]iven these repeated assertions to the bankruptcy court, there is evidence that the Sillers' conduct was not inadvertent").

24

contrary to an essential fact for the party's recovery; (3) the statement is deliberate, clear, and unequivocal; (4) giving the statement conclusive effect is consistent with the public policy upon which the rule is based; and (5) the statement is not destructive of the opposing party's theory of recovery.[36]

The Banks asserted that Flores's statements in his bankruptcy schedules met these requirements because the statements were made in the bankruptcy proceedings, were contrary to facts he must now prove to prevail, and were deliberate, clear, and unequivocal.[37] The Banks argued that giving conclusive affect to the statements would not be destructive of their defenses and would be consistent with the public policy for judicial admissions that it would be unjust to permit a party to recover after he has sworn himself out of court by a clear, unequivocal statement.

---

[36]*U.S. Fid. & Guar. Co. v. Carr*, 242 S.W.2d 224, 229 (Tex. Civ. App.—San Antonio 1951, writ ref'd); *see also Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980) (considering the differences between true judicial admissions and quasi-admissions and stating that quasi-admissions are treated as judicial admissions when they meet the requirements of judicial admissions); *DowElanco v. Benitez*, 4 S.W.3d 866, 871 (Tex. App.—Corpus Christi 1999, no pet.) (treating pleadings in another case that are inconsistent with a party's position in the present action as quasi-admissions). *But see In re A.E.A.*, 406 S.W.3d 404, 411 n.3 (Tex. App.—Fort Worth 2013, no pet.) (holding that the five-factor analysis is not applicable to admissions made in pleadings).

[37]*See In re Rollings*, 451 Fed. App'x 340, 348 (5th Cir. 2011) (per curiam) ("Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions.") (citation omitted); *Larson v. Groos Bank, N.A.*, 204 B.R. 500, 502 (W.D. Tex. 1996) (same).

Flores makes no argument about the propriety of granting summary judgment on his constitutional, common law, and statutory claims on the ground of judicial admissions.[38] Although he includes argument about whether the order lifting the automatic stay supports a finding of res judicata or collateral estoppel, he makes no argument about judicial admissions. The trial court did not specify the ground on which he granted summary judgment for the Banks, and, accordingly, because Flores did not challenge this ground on appeal, we must affirm the summary judgment for the Banks on Flores's claims that were addressed in the motion.[39] We overrule the remainder of Flores's fourth issue.

3. *Flores's first issue: summary judgment on Flores's remaining claims*

In his first issue, Flores asks whether "[t]here is sufficient summary judgment evidence to raise a fact issue to overcome [Appellees'] no evidence motions for summary judgment on Flores's claims for breach of contract, unfair debt collection practices, unreasonable collection, declaratory relief, fraud[,] and actual, mental anguish[,] and exemplary damages." As to the Banks, Flores appears to challenge under this issue the granting of the Banks' first no-evidence summary judgment motion because their no-evidence grounds against most of

---

[38] *See In re Rollings*, 451 Fed. App'x at 348; *Larson*, 204 B.R. at 502.

[39] *See Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970) ("The judgment must stand, since it may have been based on a ground not specifically challenged by the plaintiff.").

these claims were raised in that motion. In their second no-evidence motion, the Banks challenged only Flores's claim under finance code § 392.304(a)(8).[40]

But in Flores's reply to the Banks' brief, Flores changes his argument and asserts that the trial court never ruled on the Banks' first no-evidence motion. He does not argue, however, that the trial court did not rule on the Banks' second no-evidence motion. And because Flores includes argument in his brief as to the no-evidence and traditional grounds, we will construe his first issue to challenge both the traditional summary judgment and no-evidence grounds in both motions.[41]

We have already overruled Flores's arguments with respect to his claims based on the alleged invalidity of the liens. But not all of his claims were based solely on the allegation that the liens were invalid. We therefore consider whether he produced sufficient evidence to defeat summary judgment on his claims that were not based on a challenge to the validity of the liens.

3.1. Flores's breach of contract claims

Flores alleged that the Banks breached two contracts: the first deed of trust and the forbearance agreement. We first address the alleged breach of the forbearance agreement.

---

[40] Tex. Fin. Code Ann. § 392.304 (West 2006) (setting out a list of fraudulent, deceptive, or misleading representations that a debt collector may not use in collecting a debt or in obtaining information about a consumer).

[41] *See* Tex. R. App. P. 38.1(f), 38.9.

27

The Banks included a ground addressing the alleged breach of the forbearance agreement in their motion. The Banks argued that even assuming there was a forbearance agreement, which the Banks denied, the evidence conclusively showed that the parties had agreed that a forbearance would not preclude any right or remedy, including foreclosure. They pointed out that the deeds of trust stated that any forbearance by the lender would not be a waiver of or preclude the exercise of any right or remedy, including the power of sale. In the Banks' second motion for summary judgment, they pointed out that the forbearance offer also stated that they retained the right to institute foreclosure proceedings.

In BVW's summary judgment motion, it argued that the trial court had already rejected Flores's claim on the forbearance agreement when it ruled on the Banks' previous summary judgment motion, and therefore it should grant summary judgment for BVW on any of Flores's claims against it that were based on the existence of the forbearance agreement that Flores claimed was in place. And it pointed out that the forbearance offer stated that if Flores did not comply with the agreement, Wells Fargo could institute foreclosure proceedings. BVW argued that because Flores made only one payment under the forbearance offer and did not make any of the other required payments under the offer, Wells Fargo was entitled to institute foreclosure proceedings under the terms of the note and the deed of trust.

In support of their motions, the Banks provided a copy of the deed of trust and the letter setting out the terms of the forbearance offer. The deed of trust stated, "Any forbearance by Lender in exercising any right or remedy . . . shall not be a waiver of or preclude the exercise of any right or remedy." The forbearance offer stated, "All of the provisions of the note and security instrument, except as herein provided, shall remain in full force and effect." It further stated that "[t]he lender, at its option, may institute foreclosure proceedings according to the terms of the note and security instrument." BVW also attached the forbearance offer to its motion. This evidence shows that the Banks did not agree or promise to not foreclose while the modification application was pending. To the contrary, this evidence shows the Banks reserved the right to foreclose.

In his brief, Flores asserts that he raised the fact issue on this ground and points to evidence he attached to his response, which he contends raised a fact issue on whether the Banks had promised that they would not foreclose while the application was pending. As discussed below, Flores included his own affidavit and those of employees of Mortgage Solutions, stating that it was their understanding that Wells Fargo would not foreclose until the application had been accepted or rejected. As evidence of Wells Fargo's own acknowledgment of the forbearance agreement, he attached an excerpt of the deposition of Edson Muniz, a Wells Fargo employee, as well as a copy of an email chain among Wells Fargo employees. In the deposition excerpt, Muniz was asked about Flores's compliance with the terms of the forbearance offer. When asked if,

29

based upon what he had reviewed at the deposition, Flores had complied with the forbearance agreement, Muniz answered, "Yes, he did."

A series of emails he attached related to the rescission of the May 2009 foreclosure. The thread of emails included one from Cathrine Camuglia, a "Default Operations Collector" with Wells Fargo. Camuglia's email to another Wells Fargo employee stated that "This RPP [repayment plan] broke due to p[a]ym[e]nt being misapplied to the wrong loan [number] On 04/28/09 which caused the arrangements to break. R[PP] was due on 05/01/09 and was made on time. Loan went to FC sale on 05/09/09 and needs to be rescinded. Can you please review." A member of the foreclosure rescission team received the email and forwarded it to another employee, asking that employee "if we will rescind for the mortgagor and who will cover the cost to rescind the sale." Another employee responded that the sale had been rescinded.

This deposition testimony and emails do not show that Flores complied with the forbearance offer by signing the agreement and returning it, or that Wells Fargo had agreed to not foreclose while the modification application was pending. They show only that Wells Fargo had believed that Flores had failed to make a payment, thereby failing to comply with the terms of the offer, when in fact he had made the payment. And they do not show or raise a fact issue about whether Wells Fargo promised not to foreclose while Flores's modification application was pending.

Flores also relied on three letters from ASC. The first was a March 2008 forbearance offer. The second was the April 2009 forbearance offer. These offers contain substantially the same terms except for the amount of the payments that Flores was required to make. The third letter was a January 2010 letter stating, "your request for [a] Repayment Agreement has been denied for the following reason(s): You have failed to adhere to the agreed upon terms of the forbearance plan."

We have already stated that the April 2009 forbearance offer did not raise a fact question about whether the Banks promised to not foreclose. The March 2008 letter contained essentially the same terms, and therefore did not raise a fact question about whether the Banks promised to not foreclose.

As evidence of what the Banks told Flores about abstaining from exercising the right to foreclose, he relies on his own affidavit testimony and affidavits of employees of Mortgage Solutions, the entity that helped him apply for a loan modification. In an affidavit sworn to in August 2011, Flores stated that Mortgage Solutions forwarded his modification application documents to ASC and that after receiving the forbearance offer from ASC, he believed he was on the right track in pursuing modification. He stated, "It was my understanding based on this letter, conversations with [Mortgage Solutions employees] Bud Parker, Doug Corbin, Jamee Sullivan, and employees of ASC, that as long as I had a modification pending, payments on the account would be abated and ASC and [the bank that then held the note] would not foreclose on my property." He

stated that Sullivan told him after speaking with ASC that "modification would definitely be possible and that ASC would cease any foreclosure actions in process."

In a December 2011 affidavit, Flores stated that Sullivan had told him after contacting ASC that ASC would consider modification and that it would enter into a forbearance agreement on behalf of the lender while the modification was being processed. He averred that Corbin had told him that ASC had approved the modification, but as a condition, it needed payment by April 28, 2009 and several days later he received the written forbearance agreement "with the same terms Doug Corbin had communicated to [him]."

Flores further stated that after he filed suit, he received a letter from ASC advising him that it was terminating the forbearance agreement, claiming that Flores had "somehow breached the agreement." He asserted that "[t]he letter was a lie and it made [him] extremely angry since they were the ones who had not honored the agreement, but [he] was glad to get it since it acknowledged the existence of the forbearance agreement in writing."

Corbin's affidavit stated that he had worked with Wells Fargo in the past "and their policy had been that once a modification application had been accepted by them and the first payment made that they would suspend any pending foreclosures and not initiate any new ones pending a decision on the modification application." He said that when he contacted Wells Fargo, he confirmed with them that this was still their policy and that it would apply to

32

Flores's application. During the week of April 20, 2009, someone from Wells Fargo called Corbin and told him that Wells Fargo had tentatively approved the modification but that Flores had to make a payment by April 28, 2009, and to make additional payments for the next three months, and if he did so, the modification could be finalized. Corbin concluded that if Flores had known that Wells Fargo was not going to suspend its foreclosure pending the modification application, Corbin could have helped him find financing with another lender or Flores could have put the property up for sale. Corbin stated that, "it had been our clear understanding that Wells Fargo would not foreclose while the modification application was in process."

In her affidavit, Sullivan stated that she told Flores in March 2009 that her experience with Wells Fargo had been that once the modification application had been accepted, it would suspend any pending foreclosures and not initiate any new ones while a decision was pending. She stated that Wells Fargo accepted the application, and they "worked with them for several months in an effort to get the modification approved." She further stated that Wells Fargo had called Corbin and told him that ASC had tentatively approved the modification, but as a condition to modification, Flores needed to make a payment by April 28.

The testimony of Sullivan and Corbin goes to their understanding of Wells Fargo's practices in the past and what they believed Wells Fargo had agreed to with respect to Flores's loan. But Banks produced evidence that the forbearance agreement did not contain an agreement to not foreclose and that it reserved the

33

right to foreclose. The April 2009 letter from ASC reflected the terms of the forbearance offer to Flores, and Sullivan's and Corbin's testimony did not relate to anything the Banks did after the forbearance offer was given to Flores to amend the terms of the forbearance offer. They therefore do not raise a fact question about whether Banks had agreed to not foreclose.

Flores also points to the loan workout package that Mortgage Solutions sent to Wells Fargo. This evidence relates only to whether Flores submitted a request for a loan modification, not whether the Banks had agreed to not foreclose while the modification application was pending.

Flores also points to correspondence between his attorney James Manchee and BVW attorneys. Manchee stated that he spoke to someone at BVW and said that the May 2009 foreclosure was wrongful because a forbearance agreement was in place and the underlying deed of trust was void. Manchee stated that Stephen Harris at BVW said that Wells Fargo would rescind the foreclosure. Manchee further stated that in December 2009, Flores was asked to complete a modification packet, which he did, and Wells Fargo appraised the home, but Wells Fargo did not offer a loan modification to Flores.

Flores also directs us to emails from Manchee to someone at BVW[42] stating among other things that he was attaching to the email "a detailed

_____

[42]The emails begin with "Paul," but nothing in the email or the address to which the email was sent indicates who Paul is.

34

statement from [Flores] with all of the names of the ASC and Wells personnel that have knowledge of the forbearance agreement and wrongful foreclosure." He also stated in the email that "several Wells employees have admitted that [Flores] complied with [the] forbearance agreement." One of the employees listed in the email was Muniz. The other was Aaron Kinn, who from the evidence of the eviction notice appears to be affiliated with Keller Williams Realty. The email does not set out what statements Kinn made (or that he had knowledge or authority to make them) that acknowledged that a forbearance agreement was in place and that Wells Fargo had agreed to not foreclose while the modification application was pending.

Harris replied, stating that BVW had called the court that morning and would be sending over dismissal documents for the eviction suit. Harris stated, "We are going to hold off on further action on the eviction until we are satisfied that we've resolved the issues you've raised." Manchee emailed Harris soon after that asking if the process for reversing the foreclosure had been started and if he had reviewed the issue of lien validity, and Harris responded that from "the notes in our system" he could not tell if Wells Fargo had responded to BVW's inquiries yet and that he would call Wells Fargo and see if he could get some "immediate clarity."

This evidence is some evidence that the Banks made an offer of forbearance to Flores and that Flores believed that the Banks had agreed to not foreclose while the application was pending. But it does not raise a fact issue

35

about whether the Banks made representations upon which Flores could reasonably rely that they were agreeing to amend the terms of the forbearance offer and that they promised to not foreclose.

Because the evidence relied on by Flores in his brief does not raise a fact issue controverting the Banks' prima facie proof, the Banks were entitled to summary judgment on Flores's claims that were based on the allegation that the Banks breached a promise to not foreclose. Accordingly, we overrule the part of Flores's first issue that challenges the summary judgment as to his breach of contract claim based on the forbearance agreement.

The other breach of contract alleged by Flores arose out of a reimbursement payment from the insurance company for repairs made on the property. In his petition, Flores alleged that when he suffered a casualty loss on his home and filed the claim with the insurer, he obtained funds from the insurer to reimburse him for the loss, but Wells Fargo, on behalf of Deutsche Bank, refused to immediately endorse and return the insurance proceeds check to him. He alleged that this was done in an effort to coerce him into making payments on his loan in clear violation of the terms of the first note and deed of trust. He alleged that the Banks' actions breached the first deed of trust under which Flores "had an obligation to handle insurance claims and keep the property in good condition and make all repairs that were reasonably necessary but was prevented from doing so because Wells Fargo was holding the insurance proceeds hostage in an effort to collect on the account."

On appeal, Flores repeats the same assertions that under articles five and seven of the deed of trust, he had an obligation to handle insurance claims and keep the property in good condition and to make all repairs that were reasonably necessary. He argues that implicit in that obligation is Wells Fargo's cooperation.

After his home sustained storm damage in March 2009, Flores received an insurance check payable to both him and ASC. Flores alleges that in April 2009, at ASC's request, Flores endorsed the check and sent it to ASC with the understanding that ASC would return it after endorsing it. ASC delayed returning the check, and Flores argues that ASC later admitted that it was holding the check pending reinstatement or modification of the loan. Flores argues that Wells Fargo's failure to return the check to him was unreasonable and interfered with his compliance with the first deed of trust. He argues that there is sufficient evidence to raise a fact issue concerning the Banks' breach of the deed of trust.

In its summary judgment motion, the Banks argued that Flores's own breach of the first deed of trust meant that he could not prevail on his breach of contract claim. The Banks contended that there was no dispute that Flores was in material default on the note and deed of trust, and given his own material breach of the note and deed of trust, he could not maintain his own action for breach. The Banks further argued that Flores had no evidence that Banks violated the terms of the deed of trust with respect the insurance provisions. They set out the portion of the deed of trust that discussed insurance proceeds. The excerpt the Banks included states:

37

> In the event of loss . . . any insurance proceeds . . . shall be applied to restoration or repair of the Property. If the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. . . If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due.

The Banks argued that Flores did not plead or explain, and had no evidence to prove, how the Banks breached these provisions of the deed of trust that relate to insurance.

On appeal, Flores does not challenge the Banks' legal argument that a default by one party excused performance by the other party, and he does not argue that the evidence does not show that he defaulted on the note. But he challenges the propriety of summary judgment on this ground by arguing that his default was cured by the forbearance agreement, and, therefore, the Banks could not excuse their own breach of the deed of trust.

The April 22, 2009 forbearance offer letter stated that the loan was in default. The forbearance offer did not state that payment in accordance with the offer would cure that default.

The letter stated that the plan set out in the letter would "take care of some of [the] delinquency," that upon completion of the payments set out in the offer, the loan likely could be modified, and that modification "*may* satisfy the remaining past due amount on [the] loan." [Emphasis added.] This evidence does not raise

a fact issue as to whether the offer or Flores's first payment under the offer cured his default. Flores has therefore not directed us to evidence raising a fact issue about whether he was in default at the time that the Banks delayed sending him the insurance proceeds. We overrule this part of Flores's first issue.

### 3.2. Flores's claim under finance code section 392.301(a)(7)

Next under this issue, we consider Flores's challenges to the trial court's summary judgment on his statutory and common law debt collection claims, starting first with Flores's statutory debt collection claims. In his brief, Flores challenges the summary judgment on his claim for violations of finance code section 392.301(a)(7).[43] His argument in his brief as to the Banks relies on the invalidity of the first lien. We have upheld the trial court's grant of summary judgment on the Banks' and BVW's affirmative defenses to Flores's claims based on the alleged invalidity of the first lien. Flores's first issue as to this claim is overruled.

Flores argues that BVW violated this section of the finance code by prosecuting the foreclosure and seeking to evict him despite the existence of a forbearance agreement, and the trial court therefore erred by granting summary judgment for BVW on this claim. Because this claim is based on the existence of an agreement to not foreclose, we overrule this part of Flores's first issue.

---

[43] Tex. Fin. Code Ann. § 392.301 (West 2006) (providing that "a debt collector may not use threats, coercion, or attempts to coerce that employ any of" the practices that are listed in the section).

3.3. Flores's claim under finance code section 392.304(a)(8)

Flores also alleged a claim for violation of finance code section 392.304(a)(8).[44] In his brief, his argument about BVW's violation of this section is based on the invalidity of the lien and a forbearance agreement to not foreclose. We overrule this part of Flores's issue in which he challenges the summary judgment as to his claims based on these allegations.

Flores also bases a claim for violation of this section on the allegation that the Banks filed counterclaims against him for the principal balance on the notes. Before the first summary judgment motion was granted, the Banks filed counterclaims against Flores. Banks sought a declaratory judgment that the deed of trust was valid, that the "pre-discharge payment default is assessable against the property and that [Flores's] post-discharge payment default is assessable against him and/or the property as provided in the Deed of Trust,"[45] and an accounting from the trial court in the amount for all payment obligations. The Banks also asserted claims for quantum meruit and unjust enrichment. A

---

[44] *See id.* § 392.304(a)(8) (West 2006) (prohibiting a debt collector from "misrepresenting the character, extent, or amount of a consumer debt, or misrepresenting the consumer debt's status in a judicial or governmental proceeding").

[45] The Banks discussed both deeds of trust in their motion but did not specify under this ground whether they sought a declaration regarding both deeds of trust or only the first deed of trust.

few days before the trial court signed the order granting the first summary judgment, the Banks non-suited their claims.

In Flores's third amended petition, he alleged that the Banks violated section 392.304(a)(8) by misrepresenting that the debt was collectible. Specifically, Flores alleged that the Banks filed a counterclaim against him seeking a money judgment for the principal balance on the notes when, he contends, the debt had been discharged in bankruptcy and was not collectible due to the discharge injunction in place.

In their motion for summary judgment, the Banks asserted several grounds for judgment on this claim, including the ground that as a matter of law the counterclaim could not form the basis for a violation of section 392.304(a)(8) because the pleading does not constitute a demand for purposes of that section. On appeal, Flores does not challenge this ground. Accordingly, we must affirm the summary judgment as to this claim on this ground.[46]

Flores also asserted a claim against BVW for violation of section 392.304(a)(8). On appeal, much of Flores's argument as to this claim against BVW was based on the invalidity of the first lien and the existence of an agreement not to foreclose. We overrule that part of Flores's first issue. Flores also argues that because "the debt was discharged in personam by the bankruptcy," "there was no valid lien on Flores's homestead and Flores could not

---

[46] *See Malooly Bros.*, 461 S.W.2d at 121.

41

have been in default on the note," and therefore, "the representations by BVW in documents, foreclosure or eviction proceedings, and by any other means were false or misleading assertions related to the debt."

In its summary judgment motion, BVW asserted that it was entitled to summary judgment on this claim because the claim required the existence of a consumer debt. It asserted that Flores was judicially estopped from claiming that the notes and deeds of trust constituted a consumer debt. On appeal, Flores does not assign error to this ground in his original brief, challenging this ground for the first time in his reply brief. Flores's argument attacking this ground is not responsive to BVW's brief such that he could raise such an argument for the first time in a reply brief. We therefore overrule this part of Flores's first issue.[47]

---

[47] *See Lopez v. Montemayor*, 131 S.W.3d 54, 61 (Tex. App.—San Antonio 2003, pet. denied) ("A reply brief is not intended to allow an appellant to raise new issues."); *cf. Ferrant v. Graham Assocs., Inc.*, No. 02-12-00190-CV, 2014 WL 1875825, at *8 (Tex. App.—Fort Worth May 8, 2014, no. pet. h.) (mem. op. on reh'g) (addressing arguments raised for the first time in a reply brief and treating them as responsive to the appellee's brief when the appellee's brief fully briefed arguments in response to arguments that it "essentially anticipat[ed]" the appellant would raise in his reply brief). BVW pointed out in its brief that Flores had failed to attack this ground, but it did not fully brief an argument as to why the note and deed of trust are not a consumer debt. Thus, Flores's new argument is not responding to BVW's brief.

3.4. Flores's claim under finance section 392.304(a)(14)

Flores also asserted a claim for violation of finance code section 392.304(a)(14).[48] Flores contends that Wells Fargo represented to him (1) that Deutsche Bank would entertain a modification of the first lien note if Flores submitted a modification application and made certain payments and (2) that Wells Fargo and Deutsche Bank would not foreclose while the modification was pending. He argues that he complied with the conditions and paid money to Wells Fargo in reliance upon these representations. He contends that "[a] fact issue remains as to whether [the Banks] intended to actually consider a modification or merely sought to induce Flores into a false sense of security so that he would not take action to thwart any foreclosure efforts."

Reading the brief, one could conclude that the record contains sufficient support for his argument because Flores provides copious citations to the record. Flores diligently provides citations to multiple places in the record in which a single piece of evidence appears, thus giving the impression that the many record citations reflect substantial evidence to support his points. In reality, however, the record is not so supportive. For example, he provides seven record cites in support of his assertion that in reliance upon the representations, he complied with the conditions and paid the first payment to Wells Fargo. Four of

_____

[48] *See* Tex. Fin. Code Ann. § 392.304(a)(14) (prohibiting a debt collector from "representing falsely the status or nature of the services rendered by the debt collector or the debt collector's business").

43

those seven record citations are to the exact same piece of evidence—a photocopy of the money order he sent for the first forbearance payment—that appears in four different places in the record.

The evidence he cites in his brief also includes the April 2009 forbearance offer letter; the affidavit of Sullivan in which she states that it was her understanding that ASC would not foreclose on the home while modification was under consideration; Flores's affidavit stating that it was his understanding based on the forbearance offer letter and conversations with ASC employees that a forbearance agreement would be offered once he applied for modification and that the agreement would provide that as long as he had a modification pending, the property would not be foreclosed on; another page of Flores's affidavit in which he stated that Corbin had told him that ASC had approved the modification with the condition that he needed to make the April 2009 payment; and a page of his affidavit on which he stated that in his bankruptcy proceeding, he did not waive any of his rights under state law.

Flores also references the affidavit of Corbin in which Corbin stated that Wells Fargo told him that it tentatively approved the modification with the condition that the April forbearance payment be made and that if additional payments were made, the modification could be finalized. Finally, he cites to the copy of the Western Union Money order that he sent to Wells Fargo. None of this evidence raises a fact question about whether the Banks misrepresented their intention to consider his modification application and whether they did so

44

with the intention to induce him to make payments on the note. We overrule this part of Flores's first issue.

3.5. Flores's claim under finance code section 392.304(a)(19)

Flores further asserted a claim for a violation of finance code section 392.304(a)(19).[49] That section prohibits using false representations or deceptive means to collect a debt or obtain information concerning a consumer. Flores's claim under this section is based on Wells Fargo's failure to timely endorse the insurance check and return it to him.

The Banks' first motion for summary judgment did not include a traditional summary judgment ground addressing this claim, and Flores argues in his reply brief that the trial court did not grant the first no-evidence motion. But even if Flores is correct, the Banks' second motion for summary judgment incorporated the Banks' first motion for summary judgment, which did include a no-evidence ground addressing Flores's debt collection claims. In that motion, the Banks asserted that Flores had no evidence that they committed a wrongful act in violation of the debt collection practices statutes. The Banks also asserted that Flores had no evidence to prove how the Banks breached the provisions of the deed of trust that relate to insurance proceeds.

On appeal, Flores argues that "[t]here remains a fact issue regarding whether [Wells Fargo's] unreasonable and unexplained delay in returning the

[49]Tex. Fin. Code Ann. § 392.301(a)(19).

45

insurance check was for purposes of coercing Flores to make payments on the loan." But Flores does not point us to evidence raising a fact issue on this point. Flores relies on his affidavit in which he stated that ASC initially told him to send in the check for endorsement and that the funds would be returned to him immediately, but ASC did not immediately return the check. He stated that when he asked about the funds, someone with ASC initially told him that the check had been lost, but later someone at ASC admitted that the check was being held pending reinstatement or modification of the loan.

But this evidence does not raise a fact issue about whether the Banks made false representations to induce Flores to make a payment on debt. Because the check required ASC's endorsement in order to be cashed, Flores does not argue and cannot argue that he would not have sent in the check but for ASC's representation that it would remit the funds immediately. And even this statement about holding the check does not indicate that ASC never intended to send him the funds, since the statement was that ASC was holding the proceeds while the modification application was pending, not that it was definitely keeping the proceeds and applying them to the debt.

3.6.  Flores's claim under finance code section 392.304(a)(19)

Flores also argues that BVW also violated finance code section 392.304(a)(19).  His only argument under this section of his brief, however, is that "the record reflects BVW's numerous efforts on behalf of [the Banks] to use false representations and deceptive means to collect a debt."  But he does not

46

explain in this part of his brief what false representations BVW made other than allegations that we have already rejected. Accordingly, we overrule this part of Flores's first issue as to BVW.

### 3.7. Flores's common law claim of unreasonable collection

Flores also asserted a claim based on the common law tort of unreasonable collection. The elements of this tort are not clearly defined, but "[o]ne of the more precise legal descriptions delineates the conduct giving rise to the tort as 'efforts that amount to a course of harassment that was willful, wanton, malicious, and intended to inflict mental anguish and bodily harm.'"[50]

Flores argues that there is sufficient summary judgment evidence to raise a fact issue on this claim. He contends that although Wells Fargo represented that it was reviewing his modification application in good faith, after "evasive tactics, numerous delays, hostile and abusive phone conversations, and after requiring Flores to resend information which had already been provided, Wells Fargo foreclosed on Flores's property without any explanation." Flores also alleges that Wells Fargo engaged in a course of harassment even after it received his modification application by continually requesting information and documents from him that it had already received, providing him evasive responses during phone calls, failing to return his phone calls, putting him on

---

[50] *EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 868–69 (Tex. App.—Dallas 2008, no pet.).

47

hold for long periods of time, continually delaying approving the modification application, exhibiting hostility to him on several occasions, and providing him "with false assurances that things were all right when it knew a foreclosure was imminent."

These facts as alleged by Flores are not acts Wells Fargo took in attempting to collect a debt. Most of these facts as alleged by Flores describe treatment of Flores in response to his calling Wells Fargo, not acts Wells Fargo took in attempting to collect a debt. Other alleged acts, such as giving him "false assurances," even if true, do not describe an attempt to collect a debt from Flores. The acts described by Flores, if true, demonstrate poor customer service, but not a course of harassment, and certainly not one that was intended to inflict mental anguish and bodily harm.

Flores also argues that despite assurances and representations concerning the loan application process, the Banks twice foreclosed on his home and filed a suit to evict him from his home when they knew they did not have a valid deed of trust lien. We have already held that Flores may not assert a claim based on the invalidity of the lien. We hold that Flores did not raise a fact issue on his claim for unreasonable collection.

As for BVW, Flores argues that the law firm had actual knowledge of the forbearance agreement in place between him and Wells Fargo at the time it sent the August 2009 notice acceleration and notice of trustee sale. He argues that this was conduct specifically intended to cause substantial injury to him.

48

Because we have held that the trial court did not err by granting summary judgment on the ground that no binding agreement to not foreclose existed, we further hold that the trial court did not err by granting summary judgment on Flores's unreasonable collection claim against BVW.

### 3.8. Flores's fraud claim

Finally under this issue Flores argues that the Banks' summary judgment evidence to raise a fact issue on his fraud claim. He argues that Wells Fargo represented that if he applied for modification on his home loan and made certain payments, the Banks would consider the modification application in good faith and would not foreclose pending a decision on the modification application. We have already held that Wells Fargo did not promise to not foreclose while the modification application was pending. We therefore hold the trial court did not err by granting summary judgment on Flores's fraud claim.

Flores also includes argument under this issue about the sufficiency of the evidence as to his damages under these claims. Because we have held that the trial court did not err by granting summary judgment on these claims, we need not address Flores's arguments as to damages. We overrule Flores's first issue.

### 4. *Flores's second issue: BVW's status as a debt collector*

In Flores's second issue, he asked whether BVW can incur liability for unfair debt collection practices and unreasonable collection efforts when the law firm acts as a third-party debt collector. In light of our holding on Flores's other issues, we overrule this issue as moot.

**Conclusion**

Having overruled Flores's four issues, we affirm the trial court's judgment.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, MCCOY, and MEIER, JJ.

DELIVERED:  August 21, 2014